# EXHIBIT A

**Wolters Kluwer**

## Service of Process Transmittal Summary

**TO:**       Tom Le
            Experian
            475 ANTON BLVD BLDG D
            COSTA MESA, CA 92626-7037

**RE:**       **Process Served in New York**

**FOR:**      Experian Information Solutions, Inc.  (Domestic State: OH)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | WESLEY JONES vs. EQUIFAX INFORMATION SERVICES LLC |
| **DOCUMENT(S) SERVED:** | Notice, Summons, Verified Complaint and Jury Demand, Verification, Exhibit(s) |
| **COURT/AGENCY:** | New York County Supreme Court, NY<br>Case # 1508952025 |
| **NATURE OF ACTION:** | Complaint ensures that the demand for a jury trial is included |
| **PROCESS SERVED ON:** | C T Corporation System, New York, NY |
| **DATE/METHOD OF SERVICE:** | By Process Server on 02/06/2025 at 15:42 |
| **JURISDICTION SERVED:** | New York |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the service of this summons, exclusive of the day of service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Brian L. Ponder<br>Brian Ponder LLP<br>745 Fifth Avenue, Suite 500<br>New York, NY 10151<br>646-450-9461 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/07/2025, Expected Purge Date: 02/12/2025<br><br>Image SOP<br><br>Email Notification,  April Williams  april.williams@experian.com<br><br>Email Notification,  Francesca Di Iorio  francesca.diiorio@experian.com<br><br>Email Notification,  Tom Le  marina.velardi@experian.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>28 Liberty Street<br>New York, NY 10005<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |



**CT Corporation**
**Service of Process Notification**
02/06/2025
CT Log Number 548357875

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**              Thu, Feb 6, 2025
**Server Name:**       NY-NYC DROPOFFPROCESSSERVER

| | |
|---|---|
| Entity Served | EXPERIAN INFORMATION SOLUTIONS, INC. |
| Case Number | 52025 |
| Jurisdiction | NY |

| Inserts | | |
|---|---|---|
| | | |



FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 4    RECEIVED NYSCEF: 01/20/2025

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
-------------------------------------------------------------------x
WESLEY JONES,

                           Plaintiff/Petitioner,

          - against -                      Index No.

EQUIFAX INFORMATION SERVICES LLC dba
EQUIFAX; EXPERIAN INFORMATION SOLUTIONS,

                       Defendant/Respondent.
-------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

    2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney**:
  Give this Notice to your attorney. (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney**:
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 4

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

    1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

    2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated: January 20, 2025

Brian L. Ponder, Esq.
Name
BRIAN PONDER LLP

Firm Name

745 Fifth Avenue, Suite 500
Address

New York, New York 10151-0099

(646) 450-9461
Phone

brian@brianponder.com (not for servic
E-Mail

To:  Equifax Information Services LL(

Experian Information Solutions,

TransUnion (of Delaware), LLC

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| WESLEY JONES, <br><br> Plaintiff, <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX; EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN; and TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION; <br><br> Defendants. | Index No. <br><br> Date Index No. Purchased: <br><br> **SUMMONS** <br><br> The basis of venue is NY CPLR § 503(a) based on Defendant's residence in New York County, New York. |

To the above-named Defendants:

| EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX c/o Corporation Service Company 80 State Street Albany, NY 12207 | EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN c/o C T Corporation System 28 Liberty St. New York, NY 10005 | TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION c/o The Prentice-Hall Corporation System, Inc. 80 State Street Albany, NY 12207-2543 |
|---|---|---|

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

*The basis of venue is CPLR § 503(a) based on Defendant's residence in New York County, NY.*

Dated: New York, New York
      January 9, 2025

                    Brian L. Ponder, Esq.
                    BRIAN PONDER LLP
                    TRIAL LAWYERS
                    745 Fifth Avenue, Suite 500
                    New York, New York 10151-0099
                    Telephone: (646) 450-9461 (note for service)
                    Email: brian@brianponder.com (not for service)
                    ATTORNEY FOR PLAINTIFF

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WESLEY JONES,<br><br>              Plaintiff,<br><br>    v.<br><br>EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX; EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN; and TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION;<br><br>              Defendants. | Index No.<br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

## I.    INTRODUCTION

1. This is an action filed by **Plaintiff WESLEY JONES** ("Plaintiff" or "Mr. Jones"), a consumer, against three (3) consumer reporting agencies ("CRAs"), for actual damages, statutory damages, punitive damages, attorney's fees, and costs brought pursuant to 15 U.S.C. § 1681, *et seq.* (the "Fair Credit Reporting Act" or "FCRA") and for actual damages, punitive damages, statutory damages, attorney's fees ,and costs brought pursuant to the New York Fair Credit Reporting Act [General Business Law ("GBL") Art. 25 § 380, *et seq.*] ("NYFCRA") against **Defendants EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX** ("Equifax"), **EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN** ("Experian"), and **TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION** ("TransUnion") (collectively hereinafter referred to as "**Defendants**"), for their unlawful consumer reporting practices in violation of state and federal consumer laws.

## II.    THE PARTIES

### A.    Plaintiff

2. Plaintiff WESLEY JONES is an individual and natural person.

1

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

3. Mr. Jones serves as a Cyber Security Engineer for NIWC Atlantic (Naval Information Warfare Center Atlantic), a division of the United States Department of the Navy ("DON").

4. Mr. Jones is a federal government civilian.

5. Mr. Jones contributes his expertise to enhance the cybersecurity posture of naval operations of the United States Department of the Navy.

*Cyber Security Engineer*

6. A Cyber Security Engineer is a highly skilled professional specializing in designing, implementing, and maintaining security measures to protect an organization's computer systems, networks, and data from cyber threats.

7. These threats mentioned in the paragraph above can range from malware, phishing attacks, and ransomware to advanced persistent threats ("APTs") and insider threats.

8. The role of a Cyber Security Engineer is critical in safeguarding the confidentiality, integrity, and availability of information systems and ensuring compliance with regulatory and industry standards.

9. Core Responsibilities of a Cyber Security Engineer include: (1) Security Design and Implementation (e.g., Cyber Security Engineers design robust security architectures that align with organizational goals; they implement solutions such as firewalls, intrusion detection/prevention systems (IDPS), endpoint security tools, and encryption protocols; these professionals also integrate security into software development processes (DevSecOps), ensuring that applications are secure by design); (2) Threat Monitoring and Incident Response (e.g., a Cyber Security Engineer continuously monitors networks and systems for signs of compromise using Security Information and Event Management (SIEM) tools; they analyze security alerts, investigate anomalies, and lead the response to security incidents to mitigate

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

impact and prevent future occurrences; this involves drafting incident response plans and conducting forensic investigations when breaches occur); (3) Risk Assessment and Management (e.g., these engineers identify vulnerabilities through regular penetration testing, vulnerability scanning, and risk assessments; they evaluate potential risks and develop strategies to reduce exposure, including applying patches, updating configurations, or recommending process improvements); (4) Policy Development and Compliance (e.g., Cyber Security Engineers develop and enforce security policies, standards, and procedures; they ensure the organization complies with relevant regulations such as GDPR, HIPAA, CCPA, or PCI DSS; Educating staff on security best practices is also a critical part of their role, fostering a culture of security awareness); and (5) Emerging Threats and Technologies (e.g., they stay informed about the latest cyber threats, attack vectors, and mitigation techniques; Cyber Security Engineers often research and deploy advanced technologies like artificial intelligence ("AI") for threat detection or blockchain for secure transactions).

10. Required skills and knowledge for a Cyber Security Engineer include: (1) Technical Expertise (i.e., proficiency in networking, operating systems, and programming languages such as Python, Java, or C++; deep understanding of cryptography, identity and access management (IAM), and cloud security); (2) Analytical and Problem-Solving Abilities (i.e., strong analytical skills to identify vulnerabilities and respond effectively to incidents; critical thinking to design innovative security solutions); (3) Certifications and Education (i.e., many Cyber Security Engineers hold certifications like CISSP (Certified Information Systems Security Professional), CEH (Certified Ethical Hacker), or CompTIA Security+; a degree in Computer Science, Information Security, or a related field is typically preferred); and (4) Soft Skills (i.e., excellent communication to convey technical findings to non-technical stakeholders;

3

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

collaboration with IT teams, developers, and management to align security efforts with business objectives).

11. Mr. Jones has Certified Ethical Hacker and CompTIA Security+ certification.

12. Mr. Jones plans to sit for the CISSP certification exam in or about January 2025, or sooner.

13. Mr. Jones earned a Bachelor's Degree in Information Technology from Albany State University (Albany, Georgia).

14. Mr. Jones earned a Masters in Business Administration ("MBA") with a concentration in Cybersecurity from DeVry's Keller Graduate School of Management.

15. As cyber threats grow in frequency and sophistication, the demand for Cyber Security Engineers continues to surge. These professionals often work in industries like finance, healthcare, government, and technology, where data protection is paramount. Their contributions are vital in building resilient infrastructures capable of withstanding both current and emerging cyber risks.

16. In summary, a Cyber Security Engineer is not just a technical expert but also a strategic thinker who plays a pivotal role in fortifying an organization's digital ecosystem against the ever-evolving landscape of cyber threats.

*Naval Information Warfare Center Atlantic (NIWC Atlantic)*

17. "The Information Technology (IT) and electronic systems engineering, operations and support capabilities that NIWC Atlantic provides has a long history in the Continental United States (CONUS) regions." [Source: https://www.niwcatlantic.navy.mil/About/]

18. "[The] organization's history dates back more than 45 years with connections to some of the Navy's first electronic systems and information technology activities along the East Coast. Over time, our mission, name, and locations – to include expanding to locations Outside the

4

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

Continental United States (OCONUS) – have changed in order to keep up with ever-changing technologies, budgeting constraints of the Department of Defense (DoD) and needs of the warfighter." [Source: https://www.niwcatlantic.navy.mil/About/]

19. "In February 2019, the NIWC Atlantic name was applied – changing our organization from a systems center classification [formerly known as Space and Naval Warfare (SPAWAR) Systems Center Atlantic (SSC Atlantic) to an information warfare center. This change represents the expansion and increased focus on cyber for not only our organization but also the Department of the Navy (DON)." [Source: https://www.niwcatlantic.navy.mil/About/]

20. NIWC Atlantic's mission is to "[c]onduct research, development, prototyping, engineering, test and evaluation, installation, and sustainment of integrated information warfare capabilities and services across all warfighting domains with an emphasis on Expeditionary Tactical Capabilities & Enterprise IT and Business Systems in order to drive innovation and warfighter information advantage." [Source: https://www.niwcatlantic.navy.mil/About/]

21. NIWC Atlantic's vision is to "WIN THE INFORMATION WAR." [Source: https://www.niwcatlantic.navy.mil/About/]

22. NIWC Atlanta is "home to the DOD's top scientists, engineers, and technicians in the information warfare battlespace. We are forward-based, forward-deployed and globally positioned with America's warfighters." [Source: https://www.niwcatlantic.navy.mil/About/]

*The United States Department of the Navy*

23. Upon information and belief, the United States Department of the Navy is one of the three military departments within the Department of Defense of the United States of America.

24. Upon information and belief, the United States Department of the Navy was established by an Act of Congress on 30 April 1798, at the urging of Secretary of War James McHenry, to

5

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

provide a government organizational structure to the United States Navy (USN). [Source: Bernard C. Steiner and James McHenry, *The life and correspondence of James McHenry* (Cleveland: Burrows Brothers Co., 1907)].

25. Upon information and belief, since 1834, The United States Department of the Navy has exercised jurisdiction over the United States Marine Corps (USMC), and during wartime the United States Coast Guard (USCG). These branches remain at all times independent and coequal service branches within the DON. [Source: Chap. XXXV. 1 Stat. 553 from "A Century of Lawmaking for a New Nation: U. S. Congressional Documents and Debates, 1774–1875". Library of Congress, Law Library of Congress. Retrieved 24 March 2012.].

26. Upon information and belief, the United States Department of the Navy is led by the secretary of the Navy ("SECNAV"), a statutory civilian officer. [Source: 10 U.S.C. § 5013].

27. Upon information and belief, the Department of the Navy was an executive department, whose secretary served on the president's cabinet, until 1949, when amendments to the National Security Act of 1947 established the Department of Defense as a unified department for all military services; the DON, along with the Department of the Army and Department of the Air Force, became a component of the DoD, subject to the authority, direction and control of the secretary of defense. Upon information and belief, from 2001 to 2019, proposals to rename the Department of the Navy to the Department of the Navy and Marine Corps were introduced with wide support in the United States Congress, but failed due to the opposition of Senator and former U.S. Navy officer John McCain.

28. Mr. Jones holds a Top Secret Clearance with Sensitive Compartmented Information, which is also referred to as TS/SCI with a Counterintelligence Polygraph, which is the urgent purpose of this case. Consumer credit and staying clean keeps Mr. Jones security clearance upheld.

6

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

29. Mr. Jones, as someone holding a Top Secret Clearance with a Counterintelligence Polygraph, is subject to regular background check and consumer credit reviews.

30. Unlawful credit file inaccuracies, as alleged herein committed by Defendants Equifax, Experian, and TransUnion, places Mr. Jones' Top Secret clearance—and consequently his ability to work and ensure cybersecurity for the American people—at jeopardy.

*Consumer*

31. Mr. Jones is a "consumer" as defined under NY GBL § 380-A(b).

32. Mr. Jones is a "consumer" as defined under 15 U.S.C. § 1681a(c).

33. Mr. Jones in his free time enjoys working out and studying history.

## B. Defendants

### Defendant EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX ("Equifax")

34. Upon information and belief, Defendant EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX ("Equifax") is a foreign limited liability company.

35. Upon information and belief, Equifax is an American multinational consumer reporting agency (also known as "credit reporting agency") headquartered in Atlanta, Georgia.

36. Upon information and belief, Equifax is one of the three largest consumer credit reporting agencies, along with Experian and TransUnion (together known as the "Big Three").

37. Upon information and belief, Equifax collects and aggregates information on over 800 million individual consumers and more than 88 million businesses worldwide.

38. Upon information and belief, in addition to credit and demographic data and services to business, Equifax sells credit monitoring and fraud prevention services directly to consumers.

39. Upon information and belief, Equifax operates or has investments in 24 countries in the Americas, Europe, and Asia Pacific.

7

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

40. Upon information and belief, with over 14,000 employees worldwide, Equifax has nearly US$5 billion in annual revenue and is traded on the New York Stock Exchange (NYSE) under the symbol EFX.

*History of Equifax*

41. Upon information and belief, Equifax was founded by Cator and Guy Woolford in Atlanta, Georgia, as Retail Credit Company in 1899.

42. Upon information and belief, by 1920, Retail Credit Company (now known as Equifax) had offices throughout the United States and Canada.

43. Upon information and belief, by the 1960s, Retail Credit Company (now known as Equifax) was one of the United States' largest consumer reporting agencies, holding files on millions of American and Canadian citizens.

44. Upon information and belief, even though Retail Credit Company (now known as Equifax) continued to do credit reporting, the majority of its business was making reports to insurance companies when people applied for new insurance policies, such as life, auto, fire and medical insurance.

45. Upon information and belief, Retail Credit Company (now known as Equifax) also investigated insurance claims and made employment reports when people were seeking new jobs.

46. Upon information and belief, most of the credit work was then being done by a subsidiary, Retailers Commercial Agency.

47. Upon information and belief, retail Credit Company's information holdings and willingness to sell its information attracted criticism in the 1960s and 1970s. These included that it collected "... facts, statistics, inaccuracies and rumors ... about virtually every phase of a person's life; his marital troubles, jobs, school history, childhood, sex life, and political activities." Retail

8

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

Credit Company (now known as Equifax) was also alleged to reward its employees for collecting derogatory information on consumers. This led to discrimination against queer people and people of color.

48. Upon information and belief, in 1970, after the company had computerized its records, which led to wider availability of the personal information it held, the U.S. Congress held hearings that led to the enactment of the Fair Credit Reporting Act, 15 U.S.C. 1691, *et seq.* (the "FCRA").

49. The FCRA gave consumers, like Mr. Jones, rights regarding information stored about them in corporate consumer reporting agency databanks.

50. Upon information and belief, it is alleged that the hearings prompted the Retail Credit Company to change its name to Equifax in 1975 to improve its image.

51. Upon information and belief, Equifax expanded into commercial credit reports on companies in the United States, Canada and the UK, where it came into competition with companies such as Dun & Bradstreet and Experian.

52. Upon information and belief, Equifax's insurance reporting was phased out.

53. Upon information and belief, Equifax also had a division selling specialist credit information to the insurance industry but spun off this service, including the Comprehensive Loss Underwriting Exchange ("CLUE") database as ChoicePoint in 1997.

54. Upon information and belief, Equifax formerly offered digital certification services, which it sold to GeoTrust in September 2001.

55. Upon information and belief, also in 2001, Equifax spun off its payment services division, forming the publicly listed company Certegy, which subsequently acquired Fidelity National Information Services in 2006.

9

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

56. Upon information and belief, Certegy effectively became a subsidiary of Fidelity National Financial as a result of this reverse acquisition merger.

57. Upon information and belief, in October 2010, Equifax announced it was acquiring Anakam, an identity verification software company headquartered in San Diego, California, which invented and pioneered SMS (text-message based) two-factor authentication. Terms of the deal were not disclosed.

58. Upon information and belief, Equifax purchased eThority, a business intelligence (BI) company headquartered in Charleston, South Carolina, in October 2011.

59. Upon information and belief, eThority is partnering with TALX, a St. Louis-based business unit of Equifax, and remained in Charleston.

60. Upon information and belief, in February 2016, Equifax acquired the Australasian company Veda, the largest credit reference agency in Australia at the time.

61. Upon information and belief, Veda had previously acquired the Australian market research and opinion polling company ReachTEL in September 2015, which continues to produce opinion polls in Australia.

62. Upon information and belief, Equifax was the subject of more than 57,000 consumer complaints to the Consumer Financial Protection Bureau (the "CFPB") from October 2012 to September 17, 2017, with most complaints relating to incomplete, inaccurate, outdated, or misattributed information held by the company.

63. Upon information and belief, in September 2017, Equifax announced a cyber-security breach, which it claims to have occurred between mid-May and July 2017, where cybercriminals accessed approximately 145.5 million U.S. Equifax consumers' personal

10

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

data, including their full names, Social Security numbers, birth dates, addresses, and driver license numbers.

64. Upon information and belief, Equifax also confirmed at least 209,000 consumers' credit card credentials were taken in the attack.

65. Upon information and belief, on March 1, 2018, Equifax announced that 2.4 million additional U.S. customers were affected by the breach, increasing the number of affected to 147.9 million Americans.

66. Upon information and belief, Equifax claims to have discovered evidence of the cybercrime event on July 29, 2017.

67. Upon information and belief, residents in the United Kingdom (15.2 million) and Canada (about 19,000) were also impacted by the Equifax data breach.

68. Upon information and belief, the vulnerability which Chinese hackers leveraged was CVE-2017-5638; the hackers managed to stay in Equifax's systems undetected for approximately one hundred thirty-four (134) days.

69. Upon information and belief, in March 2018, the Security and Exchange Commission accused Jun Ying, Equifax's former CIO, of illicit insider trading, by selling company stock before the breach was publicly disclosed.

70. Upon information and belief, after an investigation by the FBI, Ying pleaded guilty, was sentenced to four months of prison plus a year of supervised release, and was fined $55,000.00 and ordered to pay restitution of $117,117.61 in June 2019.

71. Upon information and belief, an Equifax manager, Sudhakar Reddy Bonthu, also pleaded guilty to insider trading and received a sentence of 8 months of home confinement.

11

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

72. Upon information and belief, in July 2019, *The New York Times*, the *New York Post* and other media reported Equifax had agreed to pay approximately $650 million to settle with the Federal Trade Commission (the "FTC") to resolve investigations by several state attorneys general, the Consumer Financial Protection Bureau, the FTC, and a consumer class-action lawsuit related to the data breach.

73. Upon information and belief, by September 2019, however, Equifax had added qualifications and "hurdles" to its claims process which put in doubt whether the previously announced cash settlement of $125 per affected consumer would actually be awarded.

74. Upon information and belief, on December 19, 2019, U.S. District Chief Judge Thomas Thrash of the United States District Court for the Northern District of Georgia in Atlanta, Georgia awarded class-action attorneys representing consumers approximately $77.5 million, suggesting that individual consumers might expect to receive around six ($6) or seven ($7) dollars.

75. Upon information and belief, in July 2020, Equifax reported that, after purchasing Ansonia Credit Data ("Ansonia"), a major source of consumer credit, payments, and invoice receivables (AR) data used by financial companies and other borrowers and businesses in the shipping and logistics sectors, the firm has expanded its position in commercial payment technology solutions.

76. Upon information and belief, on August 2, 2022, a week after its CEO Mark Begor was deemed "uniquely qualified to lead the Company" and was granted a $25 million bonus package by Equifax's board, the Wall Street Journal reported that Equifax had sent millions of incorrectly calculated credit scores to lenders.

12

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

77. Upon information and belief, Equifax acknowledged reporting inaccurate credit scores, but insisted the errors had affected only a few people. The following day, a class-action lawsuit was filed by Jacksonville, Florida resident Nydia Jenkins against Equifax alleging she had received a "substantially pricier car loan" (resulting in an additional loan payment of $2,352 more per year) due to Equifax reporting her credit score 130 points off from what it should have been.

78. Upon information and belief, in February 2023, it was announced Equifax had acquired the Barueri-headquartered credit bureau, Boa Vista Serviços for $596 million, starting to trade on the B3 in São Paulo, under the symbol EFXB31.

*Equifax's Products*

79. Upon information and belief, Equifax primarily operates in the business-to-business sector, selling consumer credit and insurance reports and related analytics to businesses in a range of industries.

80. Upon information and belief, business customers include retailers, insurance firms, healthcare providers, utilities, government agencies, as well as banks, credit unions, personal and specialty finance companies and other financial institutions.

81. Upon information and belief, Equifax sells businesses consumer reports (also known as "credit reports"), analytics, demographic data, and software.

82. Upon information and belief, consumer reports (also known as "credit reports") provide detailed information on the personal credit and payment history of individuals, indicating how they have honored financial obligations such as paying bills or repaying a loan.

83. Upon information and belief, credit grantors use this information to decide what sort of products or services to offer their customers, and on what terms.

13

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

84. Upon information and belief, Equifax also provides commercial credit reports containing financial and non-financial data on businesses of all sizes.

85. Upon information and belief, Equifax collects and provides data through the National Consumer Telecom and Utilities Exchange ("NCTUE"), an exchange of non-credit data including consumer payment history on telecommunications and utility accounts.

86. Upon information and belief, in 1999, Equifax began offering services to the credit consumer sector in addition, such as credit fraud and identity theft prevention products.

87. Upon information and belief, Equifax and other credit monitoring agencies are required by law to provide US residents with one free credit file disclosure every 12 months; the Annualcreditreport.com website incorporates data from U.S. Equifax credit records (also known as consumer "files").

88. Upon information and belief, Equifax also offers fraud prevention products based on device fingerprinting such as "FraudIQ Authenticate Device."

89. Upon information and belief, Equifax also offers a credit protection service, called Equifax Protect.

*Equifax's Security failings*

90. Upon information and belief, according to United States Senator Michael Crapo, "The amount of data that the private industry and Government collect and store is very concerning. There is intrinsic vulnerability in collecting and storing personal financial information, and we need to have a meaningful discussion on how to protect and limit access to it."

*2016 advance-warnings of Equifax's insecure systems*

91. Upon information and belief, according to an October 2017 report from Motherboard (also known as *Vice*), around December 2016, a security researcher examining Equifax's servers

14

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM          INDEX NO. 150895/2025

NYSCEF DOC. NO. 1                                         RECEIVED NYSCEF: 01/20/2025

found that an online portal, created for Equifax employees only, was accessible to the open Internet.

> "I didn't have to do anything fancy," the researcher told Motherboard, explaining that the site was vulnerable to a basic "forced browsing" bug. The researcher requested anonymity out of professional concerns. "All you had to do was put in a search term and get millions of results, just instantly—in cleartext, through a web app," they said. In total, the researcher downloaded the data of hundreds of thousands of Americans in order to show Equifax the vulnerabilities within its systems. They said they could have downloaded the data of all of Equifax's customers in 10 minutes: "I've seen a lot of bad things, but not this bad."
>
> —*Motherboard*

92. Upon information and belief, the same types of sensitive private information of American consumers (names, birth dates, social security numbers, etc.) were exposed as in the May–July 2016 breach, according to Motherboard.

93. Upon information and belief, additionally, the security researchers said they were able to gain shell access on Equifax's servers and discovered and reported to Equifax additional vulnerabilities.

94. Upon information and belief, according to the reporting, despite receiving this warning from the security researcher, the affected portal was not closed until six months later in June, well after the March and May–July 2016 breaches had begun.

95. Upon information and belief, moreover, the employee portal was reportedly not the same server targeted in the later breaches, which Motherboard speculates may suggest multiple breaches by more than one party may have occurred.

15

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

### *March 2017 Equifax security breach*

96. Upon information and belief, on September 18, 2017, *Bloomberg News* reported that Equifax had been the victim of a "major breach of its computer systems" in March 2017, and that in early March it had begun "notifying a small number of outsiders and banking customers" about this attack.

97. Upon information and belief, according to Bloomberg, a person familiar with the breach believed this early-March 2017 intrusion may have been carried out by the same party that breached Equifax's computer systems again in May.

98. Upon information and belief, according to Bloomberg, Equifax enlisted Mandiant (owned by FireEye, Inc.) to assist in investigating the March attack.

99. Upon information and belief, the same cybersecurity firm was hired following the May–July 2017 breach.

### *May–July 2017 Equifax data breach*

100. Upon information and belief, between May and July 2017, currently unidentified hackers were able to use a known exploit on one of Equifax's web servers that had yet to be updated to access the credit records of more than one hundred forty (140) million Americans as well as some British and Canadian citizens before the breach was detected and shut down.

101. Upon information and belief, Equifax disclosed the breach on September 7, 2017, after determining the means and scope of the breach. The event was considered "one of the biggest data breaches in history."

102. Upon information and belief, several consumers filed lawsuits in small-claims court against Equifax due to the breach, while Equifax later came to a $575 million settlement with the

16

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                           RECEIVED NYSCEF: 01/20/2025

Federal Trade Commission to offer either a cash payment or credit monitoring for those affected by the breach.

103.    Upon information and belief, the data from the breach has yet to be seen on black markets or the dark web by security experts, making it difficult to identify the origin of the breach.

104.    Upon information and belief, however, in February 2020, the United States Department of Justice indicted four members of China's People's Liberation Army on nine charges related to the breach, which China has denied.

*2017 Equifax exposure of Argentine consumer data*

105.    Upon information and belief, in September 2017, Brian Krebs revealed that the Argentine arm of Equifax had left private data from approximately fourteen thousand (14,000) consumers, and more than one hundred (100) staff members, available to anyone who entered "admin" as both the username and password for one of its online systems.

*2017 Equifax withdrawal of vulnerable mobile app*

106.    Upon information and belief, on September 7, 2017, the same day as Equifax announced a large security breach, Equifax removed its official mobile apps from the Apple App Store and from Google Play.

107.    Upon information and belief, while these apps themselves were not reportedly connected to that breach, they had security flaws of their own, being vulnerable to man-in-the-middle attacks owing to some parts using HTTP instead of HTTPS.

*2017 Equifax exposure of American salary data*

108.    Upon information and belief, on October 8, 2017, Krebs reported that The Work Number, a website operated by Equifax's TALX division, exposed the salary histories for employees of

17

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

tens of thousands of U.S. companies to anyone in possession of the employee's Social Security Number and date of birth.

109.    Upon information and belief, for roughly half the United States population, both of the latter pieces of data are known to be in possession of criminals, following Equifax's May–July 2017 security breach.

110.    Upon information and belief, in July 2019, Equifax settled with the Federal Trade Commission for $700 million. Upon information and belief, this number contains a $380,500,000 consumer restitution fund, part of the class action lawsuit.

*Equifax Website malware*

111.    Upon information and belief, on October 12, 2017, Equifax's website was reported to have been offering visitors malware via drive-by download.

112.    Upon information and belief, the malware was disguised as an update for Adobe Flash.

113.    Upon information and belief, at that time, only three (3) out of sixty-five (65) top anti-malware products provided protection against the particular malware, meaning that many visitors were at risk of having their computers infected when visiting the Equifax website.

114.    Upon information and belief, on October 13, 2017, the attack was revealed to have been performed by hijacking third-party analytics JavaScript from Digital River brand FireClick.

115.    Upon information and belief, also on October 13, 2017, the U.S. Internal Revenue Service ("IRS") was reported to have suspended a $7.2 million contract with Equifax as a result of the attack.

*Criticism of Equifax*

116.    Upon information and belief, in 1982, Retail Credit Company (now known as Equifax) was criticized for collecting "...facts, statistics, inaccuracies and rumors... about virtually every

18

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

phase of a person's life; his marital troubles, jobs, school history, childhood, sex life, and political activities."

117.    Upon information and belief, Retail Credit Company (now known as Equifax) was charged with rewarding its employees for collecting negative information on consumers in the 1970s. There was a consent decree. In 1975 Retail Credit Company changed its name to "Equifax"—reportedly to counteract its tarnished reputation.

*Equifax Lawsuits and Fines*

118.    Upon information and belief, Equifax has been fined by the Federal Trade Commission ("FTC") on two occasions for violating the Fair Credit Reporting Act ("FCRA").

119.    Upon information and belief, in 2000, Equifax, along with Experian and TransUnion, was fined $2.5 million for blocking and delaying phone calls from consumers trying to get information about their credit.

120.    Upon information and belief, in 2003, the FTC took Equifax to court for the same reason and settled its lawsuit with the company for a fine of $250,000.

121.    Upon information and belief, in July 2013, a federal jury in Oregon awarded $18.6 million to Julie Miller ("Miller" or "Ms. Miller") of Marion County, Oregon against Equifax for violations of the Fair Credit Reporting Act.

122.    Upon information and belief, in Ms. Miller's lawsuit, Julie Miller alleged Equifax had merged her credit reports with another person with a different Social Security number, date of birth, and address.

123.    Upon information and belief, Ms. Miller contacted Equifax repeatedly in writing and over the telephone, but Equifax refused to delete dozens of false collection accounts from Ms. Miller's credit report.

19

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

124.    Upon information and belief, the award included $18.4 million in punitive damages, and $180,000 in compensatory damages.

125.    Ms. Miller's lawyer, Justin Baxter, Esq., explained that the false reporting damaged Miller's reputation, she was denied credit, and her private information was given to businesses Ms. Miller had no relationship with.

126.    Upon information and belief, the jury's verdict is believed to be the largest award in an individual case under the Fair Credit Reporting Act.

127.    Upon information and belief, an Equifax spokesperson said that Equifax is considering appealing the jury's verdict.

128.    Upon information and belief, a federal judge reduced the award to $1.62 million in 2014.

129.    Upon information and belief, in 2014, Equifax and Heartland Bank were sued by Kimberly Haman ("Haman" or "Ms. Haman") of the St. Louis, Missouri area for reporting she was dead.

130.    Upon information and belief, a Heartland Bank spokesperson said the bank "immediately investigated and contacted the credit reporting agencies after Haman reported" she was still alive.

131.    Upon information and belief, an Equifax "spokesperson told the Post-Dispatch that Equifax blocked the Heartland account information from appearing on Haman's credit report after a reporter's inquiry."

132.    Upon information and belief, in April 2014, Equifax was sued in United States District Court of the Eastern District of New York, Brooklyn, New York, by God Gazarov ("Gazarov" or "Mr. Gazarov"), who claimed the company erroneously reports him as having no credit history because of his unusual first name.

20

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1                                                          RECEIVED NYSCEF: 01/20/2025

133.    Upon information and belief, Mr. Gazarov settled his lawsuit in May 2015, with Equifax agreeing to enter his name into their database.

134.    Upon information and belief, on November 4, 2017, it was reported that a group of five Oklahomans had sued the Equifax, claiming that Equifax "violated laws which require financial institutions to protect the security of their customers' personal information."

135.    Upon information and belief, Equifax selected the law firm DLA Piper to work on the case in D.C. It had turned to Edelman for earlier crisis control after the October 2017 privacy breach.

136.    Upon information and belief, consumer lawsuits claiming damages under the FCRA have been successful in small claims court.

137.    Upon information and belief, Equifax software engineer Sudhakar Reddy was charged with insider trading for purchasing options prior to the disclosure of the 2017 data breach.

138.    Upon information and belief, in January 2020, Equifax agreed to a global settlement with the Federal Trade Commission, the Consumer Financial Protection Bureau ("CFPB"), and 50 U.S. states and territories.

139.    Upon information and belief, for those that were affected by the data breach, there were open suggestions to file claims against it.

140.    Upon information and belief, the settlement includes up to $425 million to help people affected by the data breach.

141.    Upon information and belief, Equifax ultimately reached a settlement with regulators for up to $700 million.

142.    Upon information and belief, in October 2023, the UK's Financial Conduct Authority fined Equifax more than £11 million for failing to secure UK customer data.

21

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

*Equifax's Entity Information with the New York Department of State Divisions of Corporations*

143. Upon information and belief, Equifax's New York Department of State ID # is 2647337.

144. Upon information and belief, Equifax is governed under 802 LLC – Limited Liability Law.

145. Upon information and belief, Equifax's entity status with the New York Department of State is "ACTIVE[.]"

146. Upon information and belief, Equifax's Date of Initial New York Department of State Filing is "06/06/2001[.]"

147. Upon information and belief, Equifax's Effective Date Initial Filing with the New York DOS is "06/06/2001[.]"

148. Upon information and belief, Equifax's Statement Status with the New York Department of State is "CURRENT[.]"

149. Upon information and belief, Equifax filed its application with the New York Department of State under the County of "NEW YORK[.]"

150. Upon information and belief, Equifax's original Jurisdiction as filed with the New York Department of State is "GEORGIA, UNITED STATES[.]"

*Equifax is a Consumer Reporting Agency*

151. Upon information and belief, Equifax for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports.

152. Upon information and belief, Equifax is a "consumer reporting agency" as defined under 15 U.S.C. § 1681(f).

22

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

153. Upon information and belief, Equifax regular engages in the practice of assembling or evaluating and maintaining, for the purpose of furnishing consumer credit reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, public record information and credit account information regularly and in the ordinary course of business.

154. Upon information and belief, Equifax is a "consumer credit reporting agency" as defined under NY GBL § 380-A(k).

**Defendant EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN ("Experian")**

155. Upon information and belief, Defendant EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN ("Experian") is a foreign limited liability company.

156. Upon information and belief, Experian is a multinational data analytics and consumer reporting agency ("CRA") (also known as a credit reporting company) headquartered in Costa Mesa, California and/or Dublin, Ireland.

157. Upon information and belief, Experian collects and aggregates information on over 1 billion people and businesses including 235 million individual U.S. consumers and more than 25 million U.S. businesses.

158. Upon information and belief, Experian is listed on the London Stock Exchange and is a constituent of the FTSE 100 Index.

159. Upon information and belief, Experian is a partner in USPS address validation.

160. Upon information and belief, Experian is one of the "Big Three" consumer reporting agencies, alongside TransUnion and Equifax.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

INDEX NO. 150895/2025

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 01/20/2025

161.    Upon information and belief, in addition to its credit services, Experian also sells decision analytic and marketing assistance to businesses, including individual fingerprinting and targeting.

162.    Upon information and belief, Experian's consumer services include online access to credit history and products meant to protect from fraud and identity theft.

163.    Upon information and belief, like all consumer reporting agencies, Experian is required by U.S. law to provide consumers with one (1) free credit report every year.

*Experian's History*

164.    Upon information and belief, Experian has its origins in Credit Data Corporation, a business which was acquired by TRW Inc. in 1968, and subsequently renamed TRW Information Systems and Services Inc.

165.    Upon information and belief, in November 1996, TRW sold the unit, as Experian, to Bain Capital and Thomas H. Lee Partners.

166.    Upon information and belief, just one month later, the two firms sold Experian to The Great Universal Stores Limited in Manchester, England, a retail conglomerate with millions of customers paying for goods on credit (later renamed "GUS").

167.    Upon information and belief, GUS merged its own credit-information business, CCN, which at the time was the largest credit-service company in the UK, into Experian.

168.    Upon information and belief, in October 2006, Experian was demerged from GUS and listed on the London Stock Exchange.

169.    Upon information and belief, in August 2005, Experian accepted a settlement with the Federal Trade Commission (the "FTC") over charges that Experian had violated a previous settlement with the FTC.

24

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

170.    Upon information and belief, the FTC alleged that ads for the "free credit report" did not adequately disclose that Experian customers would automatically be enrolled in Experian's $79.95 credit-monitoring program.

171.    Upon information and belief, in January 2008, Experian announced that it would cut more than 200 jobs at its Nottingham office.

172.    Upon information and belief, Experian shut down its Canadian operations on April 14, 2009.

173.    Upon information and belief, in March 2017, the U.S. Consumer Financial Protection Bureau fined Experian $3 million for providing invalid credit scores to consumers.

174.    Upon information and belief, in October 2017, Experian acquired Clarity Services, a consumer reporting agency ("CRA") specializing in alternative consumer data.

*Experian's Operations*

175.    Upon information and belief, in the United States, like the other major credit reporting bureaus, Experian is chiefly regulated by the Fair Credit Reporting Act ("FCRA").

176.    Upon information and belief, the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), signed into law in 2003, amended the FCRA to require the credit reporting companies to provide consumers with one free copy of their credit report per 12-month period.

177.    Upon information and belief, like Experian's main competitors, TransUnion and Equifax, Experian markets credit reports directly to consumers.

178.    Upon information and belief, Experian heavily markets its for-profit credit reporting service, FreeCreditReport.com, and all three agencies have been criticized and even sued for selling credit reports that can be obtained at no cost.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

179.    Upon information and belief, Experian's market segmentation tool, Mosaic, is used by political parties to identify groups of voters.

180.    Upon information and belief, in the British version there are 15 main groups, broken down into 89 hyperspecific categories, from "corporate chieftains" to "golden empty-nesters" which can be taken down to the level of individual postcodes. It was first used by the Labour Party, but then taken up by the Conservatives in the 2015 General Election campaign.

*Experian Sales to Identity Thieves*

181.    Upon information and belief, in 2013 a Vietnamese national, Hieu Minh Ngo ("Ngo"), was charged by the U.S. Department of Justice with attempting to sell personally identifiable information on hundreds of thousands of U.S. residents.

182.    Upon information and belief, this information had been allegedly purchased from Experian subsidiary and data aggregator Court Ventures.

183.    Upon information and belief, however, Ngo testified under oath that the information he had sold to identity thieves had actually been acquired from another hacker based in Russia, and not Experian or Court Ventures.

184.    Upon information and belief, Ngo then resold the information he acquired from the Russian hacker through the identity fraud enabling websites Superget.info and Findget.me.

185.    Upon information and belief, the information offered for anonymous sale on these websites included individual's name, address, Social Security number, date of birth, place of work, duration of work, state driver's license number, mother's maiden name, bank account number(s), bank routing number(s), email account(s) and other account passwords.

*2015 Experian data breach*

26

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

186.    Upon information and belief, on October 1, 2015, Experian announced that they had discovered a data breach existing between September 1, 2013, and September 16, 2015.

187.    Upon information and belief, as many as 15 million people who used the Experian's services, among them customers of American cellular company T-Mobile who had applied for Experian credit checks, may have had their private information exposed.

### 2020 Experian Data Breach

188.    Upon information and belief, in 2020 it was revealed that Experian had suffered a further data breach, on this occasion in South Africa.

189.    Upon information and belief, initially, Experian claimed that the incident had been contained but subsequently this was shown to be untrue.

190.    Upon information and belief, data on twenty-four (24) million South Africans was leaked, as well as on nearly 800,000 businesses.

191.    Upon information and belief, of these, 24,838 had financial details leaked.

### 2021 Experian Data Breach

192.    Upon information and belief, in January 2021 a new leak was revealed in Brazil, with the source being linked to Experian's Brazilian subsidiary Serasa Experian.

193.    Upon information and belief, the breach resulted in data of 220 million citizens (including some already dead) being sold in the web.

194.    Upon information and belief, this is probably the most severe data breach in history, as it includes names, social security numbers, income tax declaration forms, addresses and other private information on nearly all Brazilian citizens.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

195.    Upon information and belief, Experian claims there's no evidence that its systems have been compromised, but this lack of evidence doesn't explain it being the only probable source for the data.

196.    Upon information and belief, according to a Brazilian consumer rights foundation, the company has not been handling the breach appropriately.

*Experian's Entity Information with the New York Department of State Division of Corporations*

197.    Upon information and belief, Experian's date of initial filing with the New York Department of State Division of Corporations was 10/18/1996.

198.    Upon information and belief, Experian's effective date initial filing with the New York Department of State was 10/18/1996.

199.    Upon information and belief, Experian's foreign formation date was 02/18/1992.

200.    Upon information and belief, Experian's County listed on its New York Department application or registration is ALBANY.

201.    Upon information and belief, Experian's Jurisdiction listed on its New York Department application or registration is OHIO, UNITED STATES.

202.    Upon information and belief, Experian's New York Department of State ID is 2076147.

203.    Upon information and belief, Experian's Entity Status with the New York Department of State is ACTIVE.

204.    Upon information and belief, Experian's Statement Status with the New York Department of State is CURRENT.

205.    Upon information and belief, Experian's Next Statement Due Date with the New York Department of State Division of Corporations is 10/31/2024.

28

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM          INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 01/20/2025

206.   Upon information and belief, Experian for monetary fees, dues, or on a cooperative
nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating
consumer credit information or other information on consumers for the purpose of furnishing
consumer reports to third parties, and uses means or facilities of interstate commerce for the
purpose of preparing or furnishing consumer reports.

207.   Upon information and belief, Experian is a "consumer reporting agency" ("CRA") as
defined under 15 U.S.C. § 1681(f).

208.   Upon information and belief, Experian regular engages in the practice of assembling or
evaluating and maintaining, for the purpose of furnishing consumer credit reports to third
parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, public
record information and credit account information regularly and in the ordinary course of
business.

209.   Upon information and belief, Experian is a "consumer credit reporting agency" as defined
under NY GBL § 380-A(k).

210.   Upon information and belief, as per the New York Department of State Division of
Corporations, the post office address to which the Secretary of State shall mail a copy of any
process against Experian served upon the Secretary of State by personal delivery is:
EXPERIAN INFORMATION SOLUTIONS, INC, 475 ANTON BOULEVARD, COSTA
MESA, CA, UNITED STATES, 92626.

211.   Upon information and belief, as per the New York Department of State, Experian's chief
executive officer's name and address is: JENNIFER SCHULZ, 475 ANTON BOULEVARD,
COSTA MESA, CA, UNITED STATES, 92626.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

212.   Upon information and belief, as per the New York Department of State, Experian's principal executive office address is: 475 ANTON BOULEVARD, COSTA MESA, CA, UNITED STATES, 92626.

213.   Upon information and belief, as per the New York Department of State, Experian's registered agent's name and address is: C T CORPORATION SYSTEM, 28 LIBERTY ST., NEW YORK, NY 10005.

214.   Upon information and belief, Experian is a foreign corporation authorized to conduct business in New York.

215.   Upon information and belief, Experian is a "consumer credit reporting agency" as defined under NY GBL § 380-A(k).

### Defendant TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION ("TransUnion")

216.   Upon information and belief, Defendant TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION ("TransUnion") is a foreign limited liability company.

217.   Upon information and belief, TransUnion is an American consumer reporting agency ("CRA").

218.   Upon information and belief, TransUnion collects and aggregates information on over one billion individual consumers in over thirty countries including "200 million files profiling nearly every credit-active consumer in the United States".

219.   Upon information and belief, TransUnion's customers include over 65,000 businesses.

220.   Upon information and belief, based in Chicago, Illinois, TransUnion's 2014 revenue was US$1.3 billion.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

221.    Upon information and belief, TransUnion is the smallest of the three largest credit agencies, along with Experian and Equifax (known as the "Big Three").

222.    Upon information and belief, TransUnion also markets consumer reports (also known as "credit reports") and other credit and fraud-protection products directly to consumers.

223.    Upon information and belief, like all credit reporting agencies, TransUnion is required by U.S. law to provide consumers with one free credit report every year.

224.    Upon information and belief, additionally, a growing segment of TransUnion's business is its business offerings that use advanced big data, particularly its deep AI-TLOxp product.

*TransUnion's History*

225.    Upon information and belief, TransUnion was originally formed in 1968 as a holding company for Union Tank Car Company, making TransUnion a descendant of Standard Oil through Union Tank Car Company.

226.    Upon information and belief, the following year, TransUnion acquired the Credit Bureau of Cook County, which possessed and maintained 3.6 million credit accounts.

227.    Upon information and belief, in 1981, a Chicago-based holding company, The Marmon Group, acquired TransUnion for approximately $688 million.

228.    Upon information and belief, in 2010, Goldman Sachs Capital Partners and Advent International acquired TransUnion from Madison Dearborn Partners.

229.    Upon information and belief, in 2014, TransUnion acquired Hank Asher's data company TLO.

230.    Upon information and belief, on June 25, 2015, TransUnion became a publicly traded company for the first time, trading under the symbol TRU.

31

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

231.    Upon information and belief, TransUnion eventually began to offer products and services for both businesses and consumers.

232.    Upon information and belief, for businesses, TransUnion updated its traditional credit score offering to include trended data that helps predict consumer repayment and debt behavior. Upon information and belief, that product, referred to as CreditVision, launched in October 2013.

233.    Upon information and belief, TransUnion's SmartMove™ service facilitates credit and background checks for landlords. Upon information and belief, the service also provides credit and background checks for partner companies, such as RentSpree.

234.    Upon information and belief, in September 2013, the company acquired eScan Data Systems of Austin, Texas, to provide post-service eligibility determination support to hospitals and healthcare systems. Upon information and belief, the technology was integrated into TransUnion's ClearIQ platform, which tracks patients demographic and insurance related information to support benefit verification.

235.    Upon information and belief, in November 2013, TransUnion acquired TLO LLC, a company that leverages data in support of its investigative and risk management tools. Upon information and belief, its TLOxp technology aggregates data sets and uses a proprietary algorithm to uncover relationships between data. Upon information and belief, TLOxp also allows licensed investigators and law enforcement professionals to access personally identifiable information from credit header data.

236.    Upon information and belief, in 2014, a TransUnion analysis found that reporting rental payment information to credit bureaus can positively affect credit scores. Upon information and belief, as a result, TransUnion initiated a service called ResidentCredit, making it easy for

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

property owners to report data about their tenants on a monthly basis. Upon information and belief, these reports include the amount each tenant pays, the timeliness of their last payment, and any remaining balance the tenant currently owes. Upon information and belief, as a result, some companies have started reporting rent payment information to TransUnion.

237.    Upon information and belief, in 2015, TransUnion acquired Trustev, a digital verification company specializing in online fraud for $21 million, minus debts.

238.    Upon information and belief, in 2017, TransUnion acquired FactorTrust, a consumer reporting agency ("CRA") specializing in alternative credit data.

239.    Upon information and belief, in mid-April 2018, TransUnion announced it intended to buy UK-based CallCredit Information Group for $1.4 billion, subject to regulatory approval.

240.    Upon information and belief, in December 2021, TransUnion completed the acquisitions of Neustar, initially announced in September 2021 for $3.1 billion, and Sontiq, initially announced in October 2021 for $638 million.

241.    Upon information and belief, in February 2023, TransUnion announced it was rebranding its "thousands of existing B2B products into seven business lines." These include: TruAudience, TruValidate, TruContact (all based on former offerings from Neustar), TruVision, TruIQ, TruEmpower, and TruLookup.

*TransUnion's Legal and Regulatory Issues*

242.    Upon information and belief, in 2003, Judy Thomas of Klamath Falls, Oregon, was awarded $5.3 million in a successful lawsuit against TransUnion. Upon information and belief, the award was made on the grounds that it took her six years to get TransUnion to remove incorrect information in her consumer report a.k.a. credit report.

33

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

243.    Upon information and belief, in 2006, after spending two years trying to correct erroneous credit information that resulted from being a victim of identity theft, a fraud victim named Sloan filed suit against all three of the US's largest credit agencies. Upon information and belief, TransUnion and Experian settled out of court for an undisclosed amount. Upon information and belief, in *Sloan v. Equifax*, a jury awarded Sloan $351,000. Upon information and belief, "She wrote letters. She called them. They saw the problem. They just didn't fix it," said her attorney, A. Hugo Blankingship III.

244.    Upon information and belief, TransUnion has also been criticized for concealing charges.

245.    Upon information and belief, many TransUnion users complained of not being aware of a $17.95/month charge for holding a TransUnion account.

246.    Upon information and belief, in March 2015, following a settlement with the New York Attorney-General, TransUnion, along with other credit reporting companies, Experian and Equifax, agreed to help consumers with errors and red flags on credit reports. Upon information and belief, under the new settlement, credit-reporting firms are required to use trained employees to respond when a consumer flags a mistake on their file. Upon information and belief, these employees are responsible for communicating with the lender and resolving the dispute.

247.    Upon information and belief, in January 2017, TransUnion was fined $5.5 million and ordered to pay $17.6 million in restitution, along with Equifax, by the Consumer Financial Protection Bureau (the "CFPB").

248.    Upon information and belief, the CFPB fined TransUnion and Equifax "for deceiving consumers about the usefulness and actual cost of credit scores they sold to consumers."

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

249. Upon information and belief, the CFPB also said TransUnion and Equifax "lured consumers into costly recurring payments for credit-related products with false promises."

250. Upon information and belief, consumer reporting agencies had the most complaints of all companies filed with the CFPB by consumers in 2018, with 34% of all complaints directed at TransUnion, Equifax, and Experian that year.

251. Upon information and belief, in June 2017, a California jury ruled against TransUnion with a $60 million verdict in the largest FCRA verdict in history. Upon information and belief, the San Francisco federal court jury awarded $60 million in damages to consumers who were falsely reported on a government list of terrorists and other security threats. Upon information and belief, the plaintiffs' team of attorneys at Francis & Mailman, P.C. partnered with another California-based firm in the class action. Upon information and belief, following up on this, in April 2022, the CFPB said TransUnion is "incapable of operating its businesses lawfully."

*TransUnion's Security Issues*

252. Upon information and belief, on October 13, 2017, the website for TransUnion's Central American division was reported to have been redirecting visitors to websites that attempted drive-by downloads of malware disguised as Adobe Flash updates.

253. Upon information and belief, the attack had been performed by hijacking third-party analytics JavaScript from Digital River brand FireClick.

254. Upon information and belief, on March 17, 2022, TransUnion South Africa disclosed that hackers breached one of their servers and allegedly stole data of 54 million customers, demanding a ransom to not release it, the group N4ughtysecTU claims responsibility.

### *e-OSCAR and the ACDV Process*

35

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

255.    When a CRA receives a consumer dispute, the primary way, information about the dispute is communicated to furnishers is on a web-based platform called e-OSCAR.

256.    Information about the disputed information is transmitted over the e-OSCAR platform via an Automated Credit Dispute Verification form ("ACDV").

257.    The ACDV is a one-page form that contains identifying information about the consumer such as name, address, social security, and date of birth.

258.    The ACDV also reflects the disputed account (also known as a "tradeline") as it is currently reported.

259.    The ACDV provides limited information about the consumer's dispute, including a three-digit "dispute code" that indicates the basis of the dispute.

260.    There is sometimes a short free-form description of the dispute, based on information provided by the consumer.

261.    The ACDV may also have other relevant information attached to it, including consumer-submitted documentation supporting the dispute.

262.    After the furnisher reviews the information provided in and attached to the ACDV, it returns the ACDV to the CRA, indicating with a two-digit "response code" whether the disputed information is accurate or should be modified or deleted.

263.    The ACDV is typically the only way CRAs and furnishers communicate during a reinvestigation.

### III.    ADDITIONAL FACTUAL ALLEGATIONS

*The **Equifax** Disputes*

*THE "MONRO-DC/CBNA" DISPUTE*

36

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

264.    On February 23, 2024, Mr. Jones mailed Equifax one (1) dispute letter dated February 23,

2024, which included one (1) copy of Plaintiff's signed Social Security Card, and one (1) copy

of Plaintiff's United States Passport (collectively hereinafter referred to as the "Equifax

Dispute 1").

265.    The Equifax Dispute 1 contained Mr. Jones' full name, Social Security Number, and date

of birth, the nature of the dispute pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia.*

266.    Mr. Jones mailed Equifax Dispute 1 to "EQUIFAX INFORMATION SERVICES LLC[,]

Attn: A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield[,]

1550 Peachtree St. NE # H-46, Atlanta, GA 30309-2468" via United States Postal Service

("U.S.P.S.") Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0987 4007

15.

267.    U.S.P.S. took possession of Equifax Dispute 1 on February 23, 2024, at or about 11:54 am.

268.    U.S.P.S. delivered Equifax Dispute 1 to Equifax via an individual at Equifax on February

25, 2024, at or about 10:51 am, at its address: EQUIFAX INFORMATION SERVICES LLC,

Attn: A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield,

1550 Peachtree St. NE # H-46, Atlanta, GA 30309-2468.

269.    Mr. Jones in his Equifax Dispute 1 mailed to Equifax, disputed one (1) items of data, i.e.

one (1) tradeline, in his consumer file as "inaccurate[;]" specifically the following tradeline:

> **Account Name: MONRO-DC/CBNA**
> **Account Number 6035-5113-2057-8125**
> **11/2023 30 day late payment**

(hereinafter referred to as the "Equifax Disputed Tradeline 1").

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM   INDEX NO. 150895/2025

NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 01/20/2025

270.   The Equifax Disputed Tradeline 1 is inaccurate because the tradeline indicates a 30-day 11/2023 late payment, which is inaccurate because Mr. Jones did not pay the "MONRO-DC/CBNA" account 30 days late in 11/2023.

271.   According, Mr. Jones in his Equifax Dispute 1 letter to Equifax, informed Equifax that: "The above-listed item of information should be modified to report as follows: **11/2023: Ok and current/never [late.]**"

272.   Equifax continues to maintain the Equifax Disputed Tradeline 1 in Plaintiff's Equifax consumer file.

273.   Equifax had reason to know that the Equifax Disputed Tradeline 1 is inaccurate due to Mr. Jones' Equifax Dispute 1 that it received on February 26, 2024.

274.   Despite the foregoing, Equifax published, and continues to publish, the Equifax Disputed Tradeline 1 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

275.   Equifax failed to reasonably reinvestigate Equifax Dispute 1 and the disputed Equifax Disputed Tradeline 1, record the current status of such information, and expunge/delete or modify the disputed Tradelines, as requested by Plaintiff in Equifax Dispute 1.

276.   Equifax's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 01/20/2025

     i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

    ii.    *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

   iii.    *Impediments to Personal Purchases*: Mr. Jones has been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

277.    Mr. Jones' damages were proximately caused by Equifax's conduct alleged herein and resulted in emotional strain, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

278.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' Equifax file significantly constrained his financial freedom and stability, prompting him to consider pursue costly legal action against the Equifax, who is responsible for its erroneous consumer reporting and publishing of Equifax Disputed Tradeline 1.

279.    Equifax, in lieu of reinvestigating Mr. Jones Equifax Dispute 1 and Equifax Disputed Tradeline 1 within 30 days of its receipt of Mr. Jones Equifax Dispute 1 on February 26, 2024, sent Mr. Jones a letter dated March 3, 2024, in response to Equifax Dispute 1 stating, in part: "Dear WESLEY JONES: We have received your request concerning inaccurate information on your Equifax credit file. Because the information you provided as proof of identity does not match the information we currently have on your credit file, we ask that you **send us a copy of two different items – one from each of the two categories listed below. One item will** verify your identity and the other item will verify your identity your current address." (Hereinafter referred to as "Equifax Stall Letter 1".)

39

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

280.    Attached hereto and incorporated herein as **Exhibit A** is a redacted true and accurate copy of Equifax Stall Letter 1.

281.    Mr. Jones is not required under the FCRA to include proof of identity and address in his Equifax Dispute 1.

282.    However, Mr. Jones in his Equifax Dispute 1 included a copy of his United States Passport as proof of identity and his letter clearly indicated his address therein in the top of his letter.

283.    Furthermore, Mr. Jones' Equifax Dispute 1 contained his full name, Social Security Number, a copy of his signed Social Security Card, his date of birth, and full address therein.

284.    Specifically, Section 1681i of the FCRA does not require Mr. Jones to provide a physical proof of identity and mailing address as Equifax requires from Mr. Jones in its Equifax Stall Letter 1.

285.    Mr. Jones in response to the Equifax Stall Letter 1 that he received, on April 8, 2024, sent Equifax a letter via U.S.P.S. Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0668 8445 31, to "EQUIFAX INFORMATION SERVICES LLC[,] Attn: A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield[,] 1550 Peachtree St. NE # H-46, Atlanta, GA 30309-2468[,]" which stated the following, verbatim:

> EQUIFAX INFORMATION SERVICES LLC
> Attn: A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard and Michael G. Bonfield
> 1550 Peachtree St NE # H-46
> Atlanta, Ga 30309
>
> Re:    Failure to conduct a reinvestigation; request for damages under the FCRA
>
> To EQUIFAX INFORMATION SERVICES LLC, A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield:
>
> On 02/23/2024, I mailed you a letter disputing Inaccurate information contained in consumer reports compiled, maintained, and published by you concerning regarding the following MONROC-DC/CBNA, Account Number: 6035-5113-

40

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                   RECEIVED NYSCEF: 01/20/2025

2057-8125. As per U.S.P.S. records, you received my above-mentioned dispute letter on 02/26/2024. Accordingly, under the FCRA, you were required to conduct a reasonable reinvestigation and Modify the disputed information as I requested before the end of the 30-day period on the date on which you received my above-mentioned dispute letter. Specifically, you received my dispute letter on **02/26/2024**; therefore, your response was due on or by 03/26/2024. I have allowed for 43 days to pass to account for any delays in mailing by the U.S.P.S., but to no avail, it appears that you have willfully failed to conduct a reasonable reinvestigation and Modify the disputed information as I requested before the end of the 30-day period on the date on which you received my above-mentioned dispute letter as required under the FCRA. Instead, you have attempted to delay the investigation by alleging that I did not send the dispute. Your presumptiveness was at your risk because it does not delay your obligations under the law. Note: I did send the dispute and your time to reinvestigate and send results thereof has now expired.

As a result of your conduct as described above, you shall promptly Delete the disputed information. Additionally, as per the FCRA, you are liable to me for damages for your conduct. Thus, in addition to your Deletion of the disputed information, you are commanded to send a check in the amount of $1,000 payable to the order of Wesley Jones

Be advised, this is not another dispute or opportunity for you to reinvestigate a previous dispute. Your time period to conduct such a reinvestigation has expired and shall not be extended by law.

Promptly Delete the disputed information and send proof thereto and send me the check to my mailing address listed above in no later than fourteen (14) days of the date of this letter. Time is of the essence. If you do not timely comply with the requests within this letter, I intend to turn this matter over to a consumer lawyer for consideration of litigating the issue in federal court.

Sincerely,

[Mr. Jones' signature]

(Hereinafter referred to as "Equifax Stall Letter 1 Response".)

286.    Mr. Jones mailed Equifax Stall Letter 1 Response to Equifax on April 8, 2024.

287.    U.S.P.S. took possession of Equifax Stall Letter 1 Response on April 8, 2024, at approximately 11:33 am.

41

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

288.    U.S.P.S. delivered Equifax Stall Letter 1 Response to Equifax at Equifax's "Front Desk/Reception/Mail Room" on April 16, 2024, at approximately 1:54 pm, according to U.S.P.S. Tracking© data available on U.S.P.S.' website www.usps.com.

289.    Equifax did not respond to Mr. Jones' Equifax Stall Letter 1 Response that it received on April 16, 2024.

290.    When Mr. Jones disputed the accuracy or completeness of Equifax Tradeline 1, the FCRA required Equifax to conduct a "reasonable reinvestigation" of Equifax Dispute 1 and report the results of the reinvestigation to Mr. Jones, all within certain timelines. [15 U.S.C. 1681i(a).]

291.    At the conclusion of the reinvestigation, Equifax must modify or delete any item of information found to be inaccurate or incomplete, or that it could not verify. [15 U.S.C. § 1681i(a)(5).]

292.    For any information deleted as a result of a dispute, the FCRA imposes specific obligations on Equifax that must be satisfied before that information may be reinserted into a consumer's file. [15 U.S.C. § 1681i(a)(5)(C).]

293.    Despite its obligations under the FCRA, Equifax failed Mr. Jones, who disputed information in his consumer file at every stage of the dispute process.

294.    First, Equifax's faulty intake procedures fail to accurately convey all relevant information regarding Equifax Dispute 1 to the original furnisher Equifax Tradeline 1, and, at times, Equifax simply fails to provide furnishers with consumer-submitted documentation that supported the dispute.

295.    Second, Equifax uncritically accepted the original furnisher's response Equifax Dispute 1, even when that response was improbable or illogical on its face or when Equifax has other

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

information in its possession that alerts or should alert Equifax to the possibility that the furnisher might be unreliable.

296.    Third, at the conclusion of its purported reinvestigation, Equifax sent Mr. Jones notices that failed to inform him of the reinvestigation results, and instead provides information that is confusing, ambiguous, incorrect, and internally inconsistent.

297.    Equifax's problematic dispute resolution processes have resulted in Equifax's outright failure to reasonably reinvestigate Mr. Jone's disputes within the timeline required by the FCRA.

*THE "SC FEDERAL CREDIT UN" DISPUTE*

298.    On August 9, 2024, Mr. Jones mailed Equifax one (1) dispute letter dated August 9, 2024, which included one (1) copy of Plaintiff's signed Social Security Card, one (1) copy of Plaintiff's United States Passport, and a snapshot of Mr. Jones payment history from the SC Federal Credit Un online payment portal (collectively hereinafter referred to as the "Equifax Dispute 2").

299.    The Equifax Dispute 2 contained Mr. Jones' full name, Social Security Number, and date of birth, the nature of the dispute pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia.*

300.    Mr. Jones mailed Equifax Dispute 2 to "EQUIFAX INFORMATION SERVICES LLC[,] Attn: A. Hays Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield[,] 1550 Peachtree St. NE # H-46, Atlanta, GA 30309-2468" via United States Postal Service ("U.S.P.S.") Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0983 2665 20.

301.    U.S.P.S. took possession of Equifax Dispute 2 on August 9, 2024, at or about 1:58 pm.

43

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1                                         RECEIVED NYSCEF: 01/20/2025

302.    According to U.S.P.S. records accessed on www.usps.com, U.S.P.S. delivered Equifax

Dispute 2 to Equifax's "Front Desk/Reception/Mail Room" on August 12, 2024, at or about

2:19 pm, at Equifax's address: EQUIFAX INFORMATION SERVICES LLC, Attn: A. Hays

Wood, Chad Meyer, Dale Peterkin, Lisa Stockard, and Michael G. Bonfield, 1550 Peachtree

St. NE # H-46, Atlanta, GA 30309-2468.

**303.**    Mr. Jones in his Equifax Dispute 2 mailed to Equifax, disputed one (1) items of data, i.e.

one (1) tradeline, in his consumer file as "inaccurate and/or incomplete[;]" specifically the

following tradeline:

> **Account Name: SC Federal Credit Un**
> **Account Number: 00141053121**
> **07/2024 30 day late payment**

(hereinafter referred to as the "Equifax Disputed Tradeline 2").

304.    The Equifax Disputed Tradeline 2 is inaccurate and/or incomplete because the tradeline

indicates a 07/2024 30-day late payment, which is inaccurate because Mr. Jones did not pay

the "SC Federal Credit Un" account 30 days late in 07/2024.

305.    According, Mr. Jones in his Equifax Dispute 2 letter to Equifax, informed Equifax that:

"The above-listed item of information should be modified to report as follows: **07/2024: Ok**

**and current/never late[.]**"

306.    Equifax continues to maintain the Equifax Disputed Tradeline 2 in Plaintiff's Equifax

consumer file without modification or change as requested by Mr. Jones in Equifax Dispute 2.

307.    Equifax had reason to know that the Equifax Disputed Tradeline 2 is inaccurate and/or

incomplete due to Mr. Jones' Equifax Dispute 2 that it received on August 12, 2024.

44

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

308.    Despite the foregoing, Equifax published, and continues to publish, the Equifax Disputed Tradeline 2 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

309.    Equifax failed to reasonably reinvestigate Equifax Dispute 2 and the disputed Equifax Disputed Tradeline 2, record the current status of such information, and expunge/delete or modify the disputed Tradelines, as requested by Plaintiff in Equifax Dispute 2.

310.    Equifax's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

    i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

    ii.    *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

    iii.    *Impediments to Personal Purchases*: Mr. Jones has been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

311.    Mr. Jones' damages were proximately caused by Equifax's conduct alleged herein and resulted in emotional strain, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

312.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' Equifax file significantly constrained his financial freedom and stability, prompting him to consider pursue costly legal

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

action against the Equifax, who is responsible for its erroneous consumer reporting and publishing of Equifax Disputed Tradeline 2.

313.    Equifax, in lieu of reinvestigating Mr. Jones Equifax Dispute 2 and Equifax Disputed Tradeline 2 within 30 days of its receipt of Mr. Jones Equifax Dispute 2 on August 12, 2024, sent Mr. Jones a letter dated March 3, 2024, in response to Equifax Dispute 2 stating, in part: "Dear WESLEY JONES: We have received your request concerning inaccurate information on your Equifax credit file. Because the information you provided as proof of identity does not match the information we currently have on your credit file, we ask that you **send us a copy of two different items – one from each of the two categories listed below.** One item will verify your identity and the other item will verify your identity your current address." [(Hereinafter referred to as "Equifax Stall Letter 2".)]

314.    Attached hereto and incorporated herein as **Exhibit B** is a redacted true and accurate copy of Equifax Stall Letter 2.

315.    Mr. Jones is not required under the FCRA to include proof of identity and address in his Equifax Dispute 2.

316.    However, Mr. Jones in his Equifax Dispute 2 included a copy of his United States Passport as proof of identity, Social Security Card, and his letter clearly indicated his address therein in the top of his letter.

317.    Furthermore, Mr. Jones' Equifax Dispute 2 contained his full name, Social Security Number, a copy of his signed Social Security Card, his date of birth, and full address therein.

318.    Specifically, Section 1681i of the FDCRA does not require Mr. Jones to provide physical proof of identity and mailing address as Equifax required from Mr. Jones in its Equifax Stall Letter 2.

46

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

319.   Mr. Jones did not respond to Equifax Stall Letter 2.

320.   When Mr. Jones disputed the accuracy or completeness of Equifax Tradeline 2, the FCRA required Equifax to conduct a "reasonable reinvestigation" of Equifax Dispute 2 and report the results of the reinvestigation to Mr. Jones, all within certain timelines. [15 U.S.C. 1681i(a).]

321.   At the conclusion of the reinvestigation, Equifax must modify or delete any item of information found to be inaccurate or incomplete, or that it could not verify. [15 U.S.C. § 1681i(a)(5).]

322.   For any information deleted as a result of a dispute, the FCRA imposes specific obligations on Equifax that must be satisfied before that information may be reinserted into a consumer's file. [15 U.S.C. § 1681i(a)(5)(C).]

323.   Despite its obligations under the FCRA, Equifax failed Mr. Jones, who disputed information in his consumer file at every stage of the dispute process.

324.   First, Equifax's faulty intake procedures fail to accurately convey all relevant information regarding Equifax Dispute 2 to the original furnisher Equifax Tradeline 2, and, at times, Equifax simply fails to provide furnishers with consumer-submitted documentation that supported the dispute.

325.   Second, Equifax uncritically accepted the original furnisher's response Equifax Dispute 2, even when that response was improbable or illogical on its face or when Equifax has other information in its possession that alerts or should alert Equifax to the possibility that the furnisher might be unreliable.

326.   Third, at the conclusion of its purported reinvestigation, Equifax sent Mr. Jones notices that failed to inform him of the reinvestigation results, and instead provides information that is confusing, ambiguous, incorrect, and internally inconsistent.

47

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 01/20/2025

327.    Equifax's problematic dispute resolution processes have resulted in Equifax's outright failure to reasonably reinvestigate Mr. Jone's disputes within the timeline required by the FCRA.

### The Experian Disputes

### The "MONRO-DC/CBNA" Dispute

328.    On February 23, 2024, Mr. Jones mailed Experian one (1) dispute letter dated February 23, 2024, which included one (1) copy of Plaintiff's signed Social Security Card, and one (1) copy of Plaintiff's United States Passport (hereinafter referred to as the "Experian Dispute 1").

329.    The Experian Dispute 1 contained Mr. Jones' full name, Social Security Number, and date of birth, the nature of the dispute pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia*.

330.    Mr. Jones mailed the Experian Disputes to "EXPERIAN INFORMATION SOLUTIONS, INC.[,] Attn: Alexander Lintner, Duncan Dixon, and Jason Engel[,] 475 Anton Blvd., Costa Mesa, CA 92926-7037" via U.S.P.S. Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0987 4007 22.

331.    Experian thereafter, on March 1, 2024, received the Experian Dispute 1, as it "was picked up at a postal facility at 08:02 am on March 1, 2024 in COSTA MESA, CA 92628" by Experian, according to U.S.P.S. records available on www.usps.com. [Source: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589%200710%205270%2009 87%204007%2022]

332.    Mr. Jones in the Experian Dispute 1 mailed to Experian, disputed the following one (1) tradeline in his consumer file as "inaccurate" and/or "incomplete[,]" to wit:

**Account Name: MONRO-DC/CBNA**
**Account Number: 6035-5113-2057-8125**
**11/2023 30 day late payment**

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

(hereinafter referred to as the "Experian Tradeline1").

333.    The Experian Tradeline 1 was and is inaccurate and/or incomplete because it indicated a 30-day late payment for 11/2023, which is inaccurate because Mr. Jones did not pay the MONRO-DC/CBNA account 30 days late on 11/2023.

334.    Experian continues to maintain the Experian Tradeline 1 in Plaintiff's consumer file and consumer reports that Experian publishes to third parties concerning Plaintiff.

335.    Experian had reason to know that the Experian Tradeline 1 was and is inaccurate and/or incomplete as a result of its receipt of Experian Dispute 1 from Mr. Jones on March 1, 2024.

336.    Despite the foregoing, Experian published, and continues to publish, Experian Tradeline 1 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

337.    Experian failed to reasonably reinvestigate the Experian Tradeline 1, record the current status of such information, and expunge/delete or modify Experian Tradeline 1, as requested by Plaintiff.

338.    Experian's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

    i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

    ii.    *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

49

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

iii.    *Impediments to Personal Purchases*: Mr. Jones has been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

339.    Mr. Jones' damages that he has experienced that were proximately caused by Experian's above-alleged conduct have led to emotional strain and distress, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

340.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' Experian consumer file have significantly constrained Mr. Jones' financial freedom and stability, prompting him to consider pursuing legal action against the consumer reporting agencies responsible for the erroneous reporting, including Experian herein.

341.    Mr. Jones' damages proximately caused by Experian's conduct herein are ongoing.

342.    In response to Mr. Jones Experian Dispute 1, Experian sent a letter to Mr. Jones stating that it verified Experian Tradeline 1 as accurate.

343.    Experian failed to appropriately modify Experian Tradeline 1 as Mr. Jones requested.

344.    When Mr. Jones disputed the accuracy or completeness of Experian Tradeline 1, the FCRA required Experian to conduct a "reasonable reinvestigation" of Experian Dispute 1 and report the results of the reinvestigation to Mr. Jones, all within certain timelines. [15 U.S.C. 1681i(a).]

345.    At the conclusion of the reinvestigation, Experian must modify or delete any item of information found to be inaccurate or incomplete, or that it could not verify. [15 U.S.C. § 1681i(a)(5).]

346.    For any information deleted as a result of a dispute, the FCRA imposes specific obligations on Experian that must be satisfied before that information may be reinserted into a consumer's file. [15 U.S.C. § 1681i(a)(5)(C).]

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

347.    Despite its obligations under the FCRA, Experian failed Mr. Jones, who disputed information in his consumer file at every stage of the dispute process.

348.    First, Experian's faulty intake procedures fail to accurately convey all relevant information regarding Experian Dispute 1 to the original furnisher Experian Tradeline 1, and, at times, Experian simply fails to provide furnishers with consumer-submitted documentation that supported the dispute.

349.    Second, Experian uncritically accepted the original furnisher's response Experian Dispute 1, even when that response was improbable or illogical on its face or when Experian has other information in its possession that alerts or should alert Experian to the possibility that the furnisher might be unreliable.

350.    Third, at the conclusion of its purported reinvestigation, Experian sent Mr. Jones notices that failed to inform him of the reinvestigation results, and instead provides information that is confusing, ambiguous, incorrect, and internally inconsistent.

351.    Experian's problematic dispute resolution processes have resulted in Experian's outright failure to reasonably reinvestigate Mr. Jone's disputes within the timeline required by the FCRA.

*The "SC Federal Credit Un" Dispute*

352.    On August 9, 2024, Mr. Jones mailed Experian one (1) dispute letter dated August 9, 2024, which included one (1) copy of Plaintiff's signed Social Security Card, one (1) copy of Plaintiff's United States Passport, and a snapshot of Mr. Jones payment history from the SC Federal Credit Un online payment portal (hereinafter referred to as the "Experian Dispute 2").

353.    The Experian Dispute 2 contained Mr. Jones' full name, Social Security Number, and date of birth, the nature of the dispute pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia.*

51

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

354.    Mr. Jones mailed the Experian Disputes to "EXPERIAN INFORMATION SOLUTIONS, INC.[,] Attn: Alexander Lintner, Duncan Dixon, and Jason Engel[,] 475 Anton Blvd., Costa Mesa, CA 92926-7037" via U.S.P.S. Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0983 2665 13.

355.    Experian thereafter, on August 13, 2024, received the Experian Dispute 2, as it "was picked up at a postal facility at 7:33 am on August 13, 2024 in COSTA MESA, CA 92626" by Experian, according to U.S.P.S. records available on www.usps.com. [Source: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589%200710%205270%2009 83%202665%2013]

356.    Mr. Jones in the Experian Dispute 2 mailed to Experian, disputed the following one (1) tradeline in his consumer file as "inaccurate" and/or "incomplete[;]" to wit:

> **Account Name: SC Federal Credit Un**
> **Account Number: 00141053121**
> **07/2024 30 day late payment**

(hereinafter referred to as the "Experian Tradeline 2") and "request[ed] that it be modified[.]"

357.    Further, in Experian Dispute 2, Mr. Jones wrote:

> The above-listed item of information should be modified to report as follows:
> **07/2024: Ok and current/never late[.]**

358.    The Experian Tradeline 2 was and is inaccurate and/or incomplete because it indicated a 30-day late payment for 07/2024, which is inaccurate because Mr. Jones did not pay the SC Federal Credit Un account 30 days late on 07/2024.

359.    Experian continues to maintain the Experian Tradeline 2 in Plaintiff's consumer file and consumer reports that Experian publishes to third parties concerning Plaintiff.

360.    Experian had reason to know that the Experian Tradeline 2 was and is inaccurate and/or incomplete as a result of its receipt of Experian Dispute 2 from Mr. Jones on August 13, 2024.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

361.    Despite the foregoing, Experian published, and continues to publish, Experian Tradeline 2 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

362.    Experian failed to reasonably reinvestigate the Experian Tradeline 2, record the current status of such information, and expunge/delete or modify Experian Tradeline 2, as requested by Plaintiff.

363.    Experian's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

     i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

     ii.    *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

     iii.    *Impediments to Personal Purchases*: Mr. Jones has been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

364.    Mr. Jones' damages that he has experienced that were proximately caused by Experian's above-alleged conduct have led to emotional strain and distress, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

365.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' Experian consumer file have significantly constrained Mr. Jones' financial freedom and stability, prompting him to consider

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

pursuing legal action against the consumer reporting agencies responsible for the erroneous reporting, including Experian herein.

366.    Mr. Jones' damages proximately caused by Experian's conduct herein are ongoing.

367.    In response to Mr. Jones' Experian Dispute 2, Experian sent a letter to Mr. Jones stating that it verified Experian Tradeline 2 as accurate.

368.    Also, in response to Mr. Jones' Experian Dispute 2, Experian sent an electronic communication to Mr. Jones indicating that Experian Tradeline 2 remains in their file for him and stating, "[t]he company that reported the information has certified to Experian that the information is accurate. The item was not changed as a result of our processing of your dispute. Please review your report for the details."

369.    Experian failed to appropriately modify Experian Tradeline 2 as Mr. Jones requested.

370.    When Mr. Jones disputed the accuracy or completeness of Experian Tradeline 2, the FCRA required Experian to conduct a "reasonable reinvestigation" of Experian Dispute 2 and report the results of the reinvestigation to Mr. Jones, all within certain timelines. 15 U.S.C. 1681i(a).

371.    At the conclusion of the reinvestigation, Experian must modify or delete any item of information found to be inaccurate or incomplete, or that it could not verify. [15 U.S.C. § 1681i(a)(5).]

372.    For any information deleted as a result of a dispute, the FCRA imposes specific obligations on Experian that must be satisfied before that information may be reinserted into a consumer's file. [15 U.S.C. § 1681i(a)(5)(C).]

373.    Despite its obligations under the FCRA, Experian failed Mr. Jones, who disputed information in his consumer file at every stage of the dispute process.

54

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                           RECEIVED NYSCEF: 01/20/2025

374.    First, Experian's faulty intake procedures fail to accurately convey all relevant information regarding Experian Dispute 2 to the original furnisher Experian Tradeline 2, and, at times, Experian simply fails to provide furnishers with consumer-submitted documentation that supported the dispute.

375.    Second, Experian uncritically accepted the original furnisher's response Experian Dispute 2, even when that response was improbable or illogical on its face or when Experian has other information in its possession that alerts or should alert Experian to the possibility that the furnisher might be unreliable.

376.    Third, at the conclusion of its purported reinvestigation, Experian sent Mr. Jones notices that failed to inform him of the reinvestigation results, and instead provides information that is confusing, ambiguous, incorrect, and internally inconsistent.

377.    Experian's problematic dispute resolution processes have resulted in Experian's outright failure to reasonably reinvestigate Mr. Jone's disputes within the timeline required by the FCRA.

### The *TransUnion* Disputes

### The "MONRO-DC/CBNA" Dispute

378.    On February 23, 2024, Mr. Jones mailed TransUnion one (1) dispute letter dated February 23, 2024, which included one (1) copy of Plaintiff's signed Social Security Card, and one (1) copy of Plaintiff's United States Passport (hereinafter referred to as the "TransUnion Dispute 1").

379.    TransUnion Dispute 1 contained Mr. Jones' full name, Social Security Number, and date of birth, the nature of the disputes pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia*.

55

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

380.  Mr. Jones mailed the TransUnion Dispute 1 to TRANS UNION LLC, Attn: Aaron W. Barlow, Catherin A. Madden, Christopher Cartwright, Colleen M. Tunney, David D. McCrary, David Gilbert, David M. Neenan, Denise A. Norgle, Donald T. Pickett, Gary S. Friedlander, Geoffrey J. Hakel, Gordon E. Schaechterle, James M. Peck, Jeffrey E. Perkins, John W. Blenke, Mary K. Krupka, Michael J. Forde, Milton Silva-Craig, Mitchell R. Hoppenworth, Mohit Kapoor, Robert F. Ryan, Robert J. Callaci, Samuel A. Hamood, Steve D. Sassaman, Todd M. Cello, Vincent A. Inendino, and William R. Stockdale, 555 W. Adams St., Chicago, IL 60661, via U.S.P.S. Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0987 4007 08.

381.  TransUnion thereafter, on February 27, 2024, TransUnion Dispute 1 "was delivered to [TransUnion at its] the front desk, reception area, or mail room at 10:57 am on February 27, 2024 in CHICAGO, IL 60661[,]" according to U.S.P.S. records available at www.usps.com. [Source: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589%200710%205270%2009 87%204007%2008]

382.  Mr. Jones in TransUnion Dispute 1, which he mailed to TransUnion, disputed the following one (1) tradeline in his TransUnion consumer file as "inaccurate" and/or "incomplete[,]" to wit:

>  **Account Name: MONRO-DC/CBNA**
>  **Account Number: 6035-5113-2057-8125**
>  **11/2023 30 day late payment[]**

(hereinafter referred to as the "TransUnion Tradeline 1") and he "request[ed] that it be modified[.]"

383.  Further, Mr. Jones in his TransUnion Dispute 1 stated, "The above-listed item of information should be modified to report as follows: **11/2023: Ok and current/never** [late.]"

56

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

384.    The TransUnion Tradeline 1 was and is inaccurate and/or incomplete because it indicated a 30-day late payment for 11/2023, which is inaccurate because Mr. Jones did not pay the MONRO-DC/CBNA account 30 days late on 11/2023.

385.    TransUnion continues to maintain TransUnion Tradeline 1 in Plaintiff's consumer file.

386.    TransUnion had reason to know that TransUnion Tradeline 1 is inaccurate and/or incomplete as a result of its receipt of Mr. Jones' TransUnion Dispute 1 that it received on February 27, 2024.

387.    Despite the foregoing, TransUnion published, and continues to publish, TransUnion Tradeline 1 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

388.    TransUnion failed to reasonably reinvestigate the TransUnion Tradeline 1, record the current status of such information, and expunge/delete or modify the disputed TransUnion Tradeline 1, as requested by Plaintiff and required under applicable state and federal laws.

389.    In response to Mr. Jones' TransUnion Dispute 1, TransUnion sent a letter to Mr. Jones stating that it verified TransUnion Tradeline 1 as accurate.

390.    TransUnion's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

    i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

ii. *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

iii. *Impediments to Personal Purchases*: Mr. Jones has been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

391.    Mr. Jones' damages that he has experienced that were proximately caused by TransUnion's above-alleged conduct have led to emotional strain and distress, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

392.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' TransUnion consumer file have significantly constrained Mr. Jones' financial freedom and stability, prompting him to consider pursuing legal action against the consumer reporting agencies responsible for the erroneous reporting, including TransUnion herein.

393.    Mr. Jones' damages proximately caused by TransUnion's alleged conduct herein are continuous and ongoing.

394.    When Mr. Jones disputed the accuracy or completeness of TransUnion Tradeline 1, the FCRA required Experian to conduct a "reasonable reinvestigation" of TransUnion Dispute 1 and report the results of the reinvestigation to Mr. Jones, all within certain timelines. [15 U.S.C. 1681i(a).]

395.    At the conclusion of the reinvestigation, TransUnion must modify or delete any item of information found to be inaccurate or incomplete, or that it could not verify. [15 U.S.C. § 1681i(a)(5).]

396.    For any information deleted as a result of a dispute, the FCRA imposes specific obligations on TransUnion that must be satisfied before that information may be reinserted into a consumer's file. [15 U.S.C. § 1681i(a)(5)(C).]

58

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

397.    Despite its obligations under the FCRA, TransUnion failed Mr. Jones, who disputed information in his consumer file at every stage of the dispute process.

398.    First, TransUnion's faulty intake procedures fail to accurately convey all relevant information regarding TransUnion Dispute 1 to the original furnisher TransUnion Tradeline 1, and, at times, TransUnion simply fails to provide furnishers with consumer-submitted documentation that supported the dispute.

399.    Second, TransUnion uncritically accepted the original furnisher's response TransUnion Dispute 1, even when that response was improbable or illogical on its face or when TransUnion has other information in its possession that alerts or should alert TransUnion to the possibility that the furnisher might be unreliable.

400.    Third, at the conclusion of its purported reinvestigation, TransUnion sent Mr. Jones notices that failed to inform him of the reinvestigation results, and instead provides information that is confusing, ambiguous, incorrect, and internally inconsistent.

401.    TransUnion's problematic dispute resolution processes have resulted in TransUnion's outright failure to reasonably reinvestigate Mr. Jone's disputes within the timeline required by the FCRA.

*The "SC Federal Credit Un" Dispute*

402.    On August 9, 2024, Mr. Jones mailed TransUnion one (1) dispute letter dated August 9, 2024, which included one (1) copy of Plaintiff's signed Social Security Card, one (1) copy of Plaintiff's United States Passport, and a snapshot of Mr. Jones payment history from the SC Federal Credit Un online payment portal (hereinafter referred to as the "TransUnion Dispute 2").

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

403.   TransUnion Dispute 2 contained Mr. Jones' full name, Social Security Number, and date of birth, the nature of the disputes pursuant to the provisions of 15 U.S.C. § 1681i, *inter alia.*

404.   Mr. Jones mailed the TransUnion Dispute 2 to TRANS UNION LLC, Attn: Aaron W. Barlow, Catherin A. Madden, Christopher Cartwright, Colleen M. Tunney, David D. McCrary, David Gilbert, David M. Neenan, Denise A. Norgle, Donald T. Pickett, Gary S. Friedlander, Geoffrey J. Hakel, Gordon E. Schaechterle, James M. Peck, Jeffrey E. Perkins, John W. Blenke, Mary K. Krupka, Michael J. Forde, Milton Silva-Craig, Mitchell R. Hoppenworth, Mohit Kapoor, Robert F. Ryan, Robert J. Callaci, Samuel A. Hamood, Steve D. Sassaman, Todd M. Cello, Vincent A. Inendino, and William R. Stockdale, 555 W. Adams St., Chicago, IL 60661, via U.S.P.S. Certified Mail/Return Receipt Requested, Tracking # 9589 0710 5270 0983 2665 37.

405.   TransUnion thereafter, on August 14, 2024, TransUnion Dispute 1 "was delivered to an individual at the address at 9:15 am on August 14, 2024 in CHICAGO, IL 60661[,]" according to U.S.P.S. records available at www.usps.com. [Source: https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589%200710%205270%200983%202665%2037]

406.   Mr. Jones in TransUnion Dispute 2, which he mailed to TransUnion, disputed the following one (1) tradeline in his TransUnion consumer file as "inaccurate" and/or "incomplete[,]" to wit:

> **Account Name: SC Federal Credit Un**
> **Account Number: 00141053121**
> **97/2024 30 day late payment**

(hereinafter referred to as the "TransUnion Tradeline 2") and he "request[ed] that it be modified[.]"

60

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

407.   Further, Mr. Jones in his TransUnion Dispute 2 stated, "The above-listed item of information should be modified to report as follows: **07/2024: Ok and current/never late**[.]"

408.   TransUnion Tradeline 2 was and is inaccurate and/or incomplete because it indicated a 30-day late payment for 07/2024, which is inaccurate because Mr. Jones did not pay the SC Federal Credit Un account 30 days late on 07/2024.

409.   TransUnion continues to maintain TransUnion Tradeline 2 in Plaintiff's consumer file.

410.   TransUnion had reason to know that TransUnion Tradeline 2 is inaccurate and/or incomplete as a result of its receipt of Mr. Jones' TransUnion Dispute 2 that it received on August 14, 2024.

411.   Despite the foregoing, TransUnion published, and continues to publish, TransUnion Tradeline 2 to third parties, including, but not limited to, Plaintiff's potential and/or current creditors.

412.   TransUnion failed to reasonably reinvestigate the TransUnion Tradeline 2, record the current status of such information, and expunge/delete or modify the disputed TransUnion Tradeline 2, as requested by Plaintiff and required under applicable state and federal laws.

413.   In response to Mr. Jones' TransUnion Dispute 2, TransUnion sent a letter to Mr. Jones stating that TransUnion Tradeline 2 **"was verified as accurate**[.]"

414.   TransUnion's above-alleged conduct proximately caused Mr. Jones extensive damages, including, but not limited to, out of pocket costs and expenses for having to mail disputes, attorney's fees to consult with and litigate these issues, court fees, emotional distress, a decrease in credit/FICO score, loss of personal and business credit opportunities with potential creditors/lenders, and, more specifically:

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

    i.    *Credit Denials*: Mr. Jones has faced multiple credit card application denials, which have restricted his ability to utilize revolving credit and enjoy the benefits associated with credit card usage;

    ii.    *Business Loan Rejections*: Mr. Jones has encountered difficulties securing business loans, which have hindered his ability to invest in and expand my business endeavors.

    iii.    *Impediments to Personal Purchases*: Mr. Jones been unable to make personal purchases that could have enhanced his quality of life or addressed essential needs.

415.    Mr. Jones' damages that he has experienced that were proximately caused by TransUnion's above-alleged conduct have led to emotional strain and distress, financial setbacks, and missed financial and personal opportunities for Mr. Jones.

416.    The errors, inaccuracies, and/or incompleteness on Mr. Jones' TransUnion consumer file have significantly constrained Mr. Jones' financial freedom and stability, prompting him to consider pursuing legal action against the consumer reporting agencies responsible for the erroneous reporting, including TransUnion herein.

417.    Mr. Jones' damages proximately caused by TransUnion's alleged conduct herein are continuous and ongoing.

## IV.    JURISDICTION

418.    This court has jurisdiction under NY GBL § 380-N to enforce any liability by Defendants to Plaintiff under NY GBL § 380-M.

419.    This court has jurisdiction under 15 U.S.C. § 1681p.

420.    This court has jurisdiction under 15 U.S.C. § 1681p to enforce any liability by Defendants to Plaintiff under 15 U.S.C. § 1681n.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                      RECEIVED NYSCEF: 01/20/2025

421.    This court has jurisdiction under 15 U.S.C. § 1681p to enforce any liability by Defendants

to Plaintiff under 15 U.S.C. § 1681o.

## V.    FIRST CAUSE OF ACTION – Violations of NY GBL § 380-F ("NYFCRA")

422.    Plaintiff realleges all of the allegations contained in the paragraphs above verbatim.

423.    NY GBL § 380-F provides:

**(a)** If a consumer disputes any item of information contained in his file, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall promptly re-investigate and record the current status of such information, unless it has reasonable grounds to believe that the dispute by the consumer is frivolous, and it shall promptly notify the consumer of the result of its investigation, its decision on the status of the information and his rights pursuant to this section. The presence of contradictory information in a consumer's file shall not, in and of itself, constitute reasonable grounds for believing the dispute is frivolous.
**(b)** If, after conducting the re-investigation required by subdivision (a) of this section, the consumer reporting agency finds that an item is in error or that it can no longer be verified, it shall:
    **(1)** promptly expunge the item and otherwise correct the file,
    **(2)** refrain from reporting the item in subsequent consumer reports,
    **(3)** clearly and conspicuously disclose to the consumer his rights to make a request for notification and upon request of the consumer, promptly notify any person designated by the consumer who has received information regarding the item during the previous year that an error existed, and shall furnish such person with the corrected information, and
    **(4)** where applicable forward a copy of the consumer's statement pursuant to subdivision (c) of this section.
**(c)** If, after conducting a re-investigation pursuant to this section, the consumer reporting agency is unable to resolve any remaining differences between the statements made by its sources and the consumer, it shall:
    **(1)** promptly indicate in the file that the item is disputed,
    **(2)** permit the consumer to file a statement concerning the nature of the dispute, which statement may be limited by the agency to not more than one hundred words if such agency provides the consumer with assistance in writing a clear summary of the dispute,
    **(3)** include the consumer's statement of the dispute in all subsequent credit reports containing the information in question, and
    **(4)** clearly note in all subsequent consumer reports that the item is disputed by the consumer.
**(d)** Notwithstanding any other provision of this section, if any item disputed and reinvestigated is found to be in error or can no longer be verified, upon completion of the reinvestigation of all items disputed, the agency shall promptly mail the

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

consumer a corrected written copy of the file, reflecting any changes, with an explanation of any code used, at no charge to the consumer.

N.Y. Gen. Bus. Law § 380-F.

424.    NY GBL § 380-L provides:

Any person, firm, partnership, corporation, or association whose knowing and willful violation of section three hundred eighty-s of this article resulted in the transmission or provision to a consumer reporting agency of information that would otherwise not have been transmitted or provided, and any consumer reporting agency or user of information who or which willfully and knowingly fails to comply with any requirement imposed under this article with respect to any consumer is liable to that consumer in an amount equal to the sum of:
(a) Any actual damages sustained by the consumer as a result of such failure or as a result of a violation of section three hundred eighty-s of this article;
(b) Such amount of punitive damages as the court may allow; and
(c) In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

NY GBL § 380-L.

425.    NY GBL § 380-M:

Any consumer reporting agency or user of information who or which is negligent in failing to comply with any requirement imposed under this article, other than a violation of section three hundred eighty-t of this article, with respect to any consumer is liable to that consumer in an amount equal to the sum of:
(a) Any actual damages sustained by the consumer as a result of the failure;
(b) In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

NY GBL § 380-M.

426.    Plaintiff disputed items of information or data contained in his consumer file(s) maintained

by Defendant with Defendants, and each of them.

427.    Plaintiff directly conveyed his disputes to Defendants, and each of them, via United States

Postal Service Certified Mail/Return Receipt Requested.

64

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

428.    Upon receipt of Plaintiff's disputes, Defendants, and each of them, failed to promptly reasonably re-investigate the disputed items of information or data, i.e., tradelines, and record the current status of such items of information or data, i.e., tradelines.

429.    Defendants, and each of them, did not have reasonable grounds to believe that Plaintiff's disputes were frivolous.

430.    Defendants, and each of them, failed to find Plaintiff's disputed items of information or data, i.e., tradelines, in error of that could no longer be verified and failed to promptly expunge the items of information or data, i.e., tradelines, or otherwise correct the items of information or data, i.e., tradelines.

431.    Defendants, and each of them, failed to refrain from reporting the disputed items of information or data, i.e., tradelines, in subsequent consumer reports concerning Plaintiff that Defendants, and each of them, published to third parties.

432.    Defendants, and each of them, being unable to resolve the differences, i.e., disputes, with Plaintiff, failed to promptly indicate the disputed items of information or data, i.e., tradelines, in Plaintiff's consumer file as disputed in Plaintiff's consumer reports, which Defendants, and each of them, subsequently furnished to third parties.

433.    Defendants' alleged conduct against Plaintiff herein was willful.

434.    Defendants' alleged conduct against Plaintiff herein was negligent.

435.    As a result of Defendants' violations of the NYFCRA, Plaintiff has suffered, continues to suffer, and will suffer future damages, including, but not limited to, denial of credit, lost opportunity to receive credit, damage to reputation, worry, distress, frustration, embarrassment, and humiliation, all to his damages, in an amount to be determined by the jury.

65

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

436.   In order to punish such conduct by Defendants, and each of them, and to deter Defendants, and each of them, and others from engaging in similar practices hereafter, Plaintiffs are entitled to an award of actual damages and punitive damages, in an amount to be determined by the trier of fact, and costs of this action together with reasonable attorney's fees, pursuant to the provisions of NY GBL § 380-L.

437.   In order to punish such conduct by Defendants, and each of them, and to deter Defendants, and each of them, and others from engaging in similar practices hereafter, Plaintiffs are entitled to an award of actual damages, in an amount to be determined by the trier of fact, and costs of this action together with reasonable attorney's fees, pursuant to the provisions of NY GBL § 380-M.

## VI.   SECOND CAUSE OF ACTION – Violations of the FCRA, including:
  a.   **Failure to Conduct a Reasonable Reinvestigation and Failure to Provide Furnishers with All Relevant Information in Violation of 15 U.S.C. § 1681i(a)(1)(A), (2);**
  b.   **Failure to Forward Disputes in Violation of 15 U.S.C. § 1681i(a)(2)(A);**
  c.   **Unreasonable Over-Reliance on a Furnisher's ACDV Response in Violation of 15 U.S.C. § 1681i(a)(1)(A);**
  d.   **Failure to Delete Inaccurate, Incomplete, or Unverified Information in Violation of 15 U.S.C. § 1681i(a)(5)(A); and/or**
  e.   **Failure to Provide Notice of the Results of the Reinvestigation in Violation of 15 U.S.C. § 1681i(a)(6)(A)**

438.   Plaintiff realleges all of the allegations contained in the paragraphs above verbatim.

439.   15 U.S.C. § 1681i provides:

**(a) Reinvestigations of disputed information**
    **(1) Reinvestigation required**
        **(A) In general**
Subject to subsection (f) and except as provided in subsection (g), if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph

66

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1                                       RECEIVED NYSCEF: 01/20/2025

(5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

### (B) Extension of period to reinvestigate

Except as provided in subparagraph (C), the 30-day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30-day period that is relevant to the reinvestigation.

### (C) Limitations on extension of period to reinvestigate

Subparagraph (B) shall not apply to any reinvestigation in which, during the 30-day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

### (2) Prompt notice of dispute to furnisher of information

### (A) In general

Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

### (B) Provision of other information

The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer or the reseller after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

### (3) Determination that dispute is frivolous or irrelevant

### (A) In general

Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

### (B) Notice of determination

Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

### (C) Contents of notice

A notice under subparagraph (B) shall include-
(i) the reasons for the determination under subparagraph (A); and(ii) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

### (4) Consideration of consumer information

67

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

### (5) Treatment of inaccurate or unverifiable information

#### (A) In general

If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall-

(i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and

(ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

#### (B) Requirements relating to reinsertion of previously deleted material

##### (i) Certification of accuracy of information

If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

##### (ii) Notice to consumer

If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

##### (iii) Additional information

As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion-

(I) a statement that the disputed information has been reinserted;

(II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

(III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

#### (C) Procedures to prevent reappearance

A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the

68

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025
NYSCEF DOC. NO. 1                                       RECEIVED NYSCEF: 01/20/2025

consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

### (D) Automated reinvestigation system

Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

### (6) Notice of results of reinvestigation

#### (A) In general

A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

#### (B) Contents

As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5-day period referred to in subparagraph (A)-

(i) a statement that the reinvestigation is completed;

(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

(v) a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

### (7) Description of reinvestigation procedure

A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iii) by not later than 15 days after receiving a request from the consumer for that description.

### (8) Expedited dispute resolution

If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency-

(A) provides prompt notice of the deletion to the consumer by telephone;

69

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

   **(B)** includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

   **(C)** provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.

**(b) Statement of dispute**

If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute.

**(c) Notification of consumer dispute in subsequent consumer reports**

Whenever a statement of a dispute is filed, unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof.

**(d) Notification of deletion of disputed information**

Following any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or any notation as to disputed information, the consumer reporting agency shall, at the request of the consumer, furnish notification that the item has been deleted or the statement, codification or summary pursuant to subsection (b) or (c) to any person specifically designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose, which contained the deleted or disputed information.

**(e) Treatment of complaints and report to Congress**

  **(1) In general**

The Commission[1] shall-

   **(A)** compile all complaints that it receives that a file of a consumer that is maintained by a consumer reporting agency described in section 1681a(p) of this title contains incomplete or inaccurate information, with respect to which, the consumer appears to have disputed the completeness or accuracy with the consumer reporting agency or otherwise utilized the procedures provided by subsection (a); and

   **(B)** transmit each such complaint to each consumer reporting agency involved.

  **(2) Exclusion**

Complaints received or obtained by the Bureau pursuant to its investigative authority under the Consumer Financial Protection Act of 2010 shall not be subject to paragraph (1).

  **(3) Agency responsibilities**

Each consumer reporting agency described in section 1681a(p) of this title that receives a complaint transmitted by the Bureau pursuant to paragraph (1) shall-

70

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

(A) review each such complaint to determine whether all legal obligations imposed on the consumer reporting agency under this subchapter (including any obligation imposed by an applicable court or administrative order) have been met with respect to the subject matter of the complaint;

(B) provide reports on a regular basis to the Bureau regarding the determinations of and actions taken by the consumer reporting agency, if any, in connection with its review of such complaints; and

(C) maintain, for a reasonable time period, records regarding the disposition of each such complaint that is sufficient to demonstrate compliance with this subsection.

**(4) Rulemaking authority**

The Commission[1] may prescribe regulations, as appropriate to implement this subsection.

**(5) Annual report**

The Commission[1] shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives an annual report regarding information gathered by the Bureau under this subsection.

**(f) Reinvestigation requirement applicable to resellers**

**(1) Exemption from general reinvestigation requirement**

Except as provided in paragraph (2), a reseller shall be exempt from the requirements of this section.

**(2) Action required upon receiving notice of a dispute**

If a reseller receives a notice from a consumer of a dispute concerning the completeness or accuracy of any item of information contained in a consumer report on such consumer produced by the reseller, the reseller shall, within 5 business days of receiving the notice, and free of charge-

(A) determine whether the item of information is incomplete or inaccurate as a result of an act or omission of the reseller; and

(B) if-

(i) the reseller determines that the item of information is incomplete or inaccurate as a result of an act or omission of the reseller, not later than 20 days after receiving the notice, correct the information in the consumer report or delete it; or

(ii) if the reseller determines that the item of information is not incomplete or inaccurate as a result of an act or omission of the reseller, convey the notice of the dispute, together with all relevant information provided by the consumer, to each consumer reporting agency that provided the reseller with the information that is the subject of the dispute, using an address or a notification mechanism specified by the consumer reporting agency for such notices.

**(3) Responsibility of consumer reporting agency to notify consumer through reseller**

Upon the completion of a reinvestigation under this section of a dispute concerning the completeness or accuracy of any information in the file of a consumer by a

71

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

consumer reporting agency that received notice of the dispute from a reseller under paragraph (2)-

    **(A)** the notice by the consumer reporting agency under paragraph (6), (7), or (8) of subsection (a) shall be provided to the reseller in lieu of the consumer; and

    **(B)** the reseller shall immediately reconvey such notice to the consumer, including any notice of a deletion by telephone in the manner required under paragraph (8)(A).

    **(4) Reseller reinvestigations**

No provision of this subsection shall be construed as prohibiting a reseller from conducting a reinvestigation of a consumer dispute directly.

**(g) Dispute process for veteran's medical debt**

    **(1) In general**

With respect to a veteran's medical debt, the veteran may submit a notice described in paragraph (2), proof of liability of the Department of Veterans Affairs for payment of that debt, or documentation that the Department of Veterans Affairs is in the process of making payment for authorized hospital care, medical services, or extended care services rendered to a consumer reporting agency or a reseller to dispute the inclusion of that debt on a consumer report of the veteran.

    **(2) Notification to veteran**

The Department of Veterans Affairs shall submit to a veteran a notice that the Department of Veterans Affairs has assumed liability for part or all of a veteran's medical debt.

    **(3) Deletion of information from file**

If a consumer reporting agency receives notice, proof of liability, or documentation under paragraph (1), the consumer reporting agency shall delete all information relating to the veteran's medical debt from the file of the veteran and notify the furnisher and the veteran of that deletion.

[1]So in original. Probably should be "Bureau".

15 U.S.C. § 1681i.

440.    15 U.S.C. § 1681n provides:

**(a) In general**

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of-

    **(1)**

        **(A)** any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

        **(B)** in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

72

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

**(b) Civil liability for knowing noncompliance**

Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.

**(c) Attorney's fees**

Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

**(d) Clarification of willful noncompliance**

For the purposes of this section, any person who printed an expiration date on any receipt provided to a consumer cardholder at a point of sale or transaction between December 4, 2004, and June 3, 2008, but otherwise complied with the requirements of section 1681c(g) of this title for such receipt shall not be in willful noncompliance with section 1681c(g) of this title by reason of printing such expiration date on the receipt.

15 U.S.C. § 1681n

441.    15 U.S.C. § 1681o provides:

**(a) In general**

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of-

(1) any actual damages sustained by the consumer as a result of the failure; and    (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

**(b) Attorney's fees**

On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

15 U.S.C. § 1681o.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

442.    After receiving notice that Mr. Jones disputed items of information contained in his consumer file, Defendants, and each of them, had five (5) business days to notify the respective furnishers of the information disputed by Mr. Jones. 15 U.S.C. § 1681i(a)(2)(A).

443.    For the disputes alleged herein, Defendants, and each of them, did not forward the respective disputed identified herein to the respective furnishers within five (5) business days.

444.    Therefore, Defendants, and each of them, violated 15 U.S.C. § 1681i(a)(2)(A).

445.    The FCRA requires a Defendants, and each of them, to conduct a reasonable reinvestigation and to notify and provide all relevant information regarding Mr. Jones dispute(s) that they received from Mr. Jones to the furnisher of the disputed information. [15 U.S.C. § 1681i(a)(1)(A), (2).]

446.    Defendants, and each of them, did not conduct a reasonable reinvestigation or convey to furnishers all relevant information it receives from Mr. Jones when they incorrectly applied generic dispute codes despite more specific codes being available, uses dispute codes that inaccurately describe Mr. Jones' respective disputes alleged herein, and applied dispute codes requesting updates that are already reflected on Mr. Jones respective disputed tradelines herein.

447.    Defendants, and each of them, do not conduct a reasonable reinvestigation or convey to furnishers all relevant information it received from Mr. Jones when it failed to forward relevant consumer documentation.

448.    Therefore, Defendants' actions violated and continue to violate 15 U.S.C. § 1681i(a)(1)(A), (2).

449.    When Mr. Jones disputes the completeness or accuracy of items contained in his consumer file, Defendants, and each of them, were required to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate, and record the current status of the

74

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

disputed information, or delete the item from the file in accordance with paragraph (5)." [15 U.S.C. § 1681i(a)(1)(A).]

450. Rather than undertaking a reasonable reinvestigation, Defendants, and each of them, unreasonably relied on furnishers' ACDV responses in at least three categories of disputes: (1) disputes where the consumer provided information that alerted or should have alerted Defendants, and each of them, to the possibility that the furnisher might be unreliable, (2) disputes where Defendants, and each of them, already had information that alerted or should have alerted Defendants, and each of them, to the possibility that the furnisher might be unreliable and (3) disputes where Defendants, and each of them, received illogical and inconsistent ACDV responses from furnishers that alerted or should have alerted Defendants, and each of them, to the possibility that the furnisher might be unreliable. In each of these instances, Defendants, and each of them, had affirmative notice that the information received from the furnishers may be suspect.

451. In such disputes, Defendants, and each of them, possessed information that the disputed consumer data was inaccurate, and thus the original source of the disputed data – namely, the respective furnisher – is unreliable. Nevertheless, Defendants, and each of them, uncritically accepted and implemented furnishers' ACDV responses.

452. When Defendants' reinvestigation consisted solely of sending an ACDV to a furnisher and implementing the respective furnisher's response(s) despite (1) having or receiving evidence of that furnisher's unreliability, and (2) the existence of readily available, cost-effective additional investigative measures, Defendants, and each of them, failed to conduct a reasonable reinvestigation.

453. Therefore, Defendants' actions violated and continue to violate 15 U.S.C. § 1681i(a)(1)(A).

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

454. The FCRA requires a CRA to delete any information found to be inaccurate, incomplete, or unverified after a reinvestigation. [15 U.S.C. § 1681i(a)(5)(A).]

455. Defendants, and each of them, did not delete the information that Mr. Jones disputed from Mr. Jones' consumer files despite the fact that the respective furnishers identified the information as inaccurate and/or incomplete and requested their deletion.

456. Defendants, and each of them, did not delete the information that Mr. Jones disputed from Mr. Jones' consumer files despite the fact that the respective information was inaccurate and/or incomplete and Mr. Jones requested their deletion.

457. Therefore, Defendants, and each of them, violated 15 U.S.C. § 1681i(a)(5)(A).

458. The FCRA requires CRAs, including Defendants, to provide written notice to a consumer of the results of a reinvestigation. [15 U.S.C. § 1681i(a)(6)(A).]

459. Defendants' purported notices to Mr. Jones routinely failed to disclose the results of their purported reinvestigations of Mr. Jones respective disputes to Defendants because the notices stated two contradictory results, are incomplete, or are unintelligible.

460. Therefore, Defendants' actions violated and continue to violate 15 U.S.C. § 1681i(a)(6)(A).

461. Plaintiff disputed inaccurate and/or incomplete data in his files maintained by Defendants, and each of them.

462. Plaintiff's disputes were directly made and sent to Defendants, and each of them, via U.S.P.S. mail.

463. Defendants, and each of them, failed to conduct a reasonable investigation to determine whether the disputed items of information or data were inaccurate or incomplete and record the current status of the disputed Tradelines, or delete disputed items of information or data from the consumer file maintained by Defendants, and each of them, concerning Plaintiff

76

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 1

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

before the end of the 30-day period beginning on the date on which Defendants, and each of them, received the notice of the subject dispute(s) from Plaintiff.

464. Defendants, and each of them, failed to maintain reasonable procedures designed to avoid the violations above.

465. Defendants, and each of them, are liable to Mr. Jones under 15 U.S.C. § 1681n.

466. Defendants, and each of them, are liable to Mr. Jones under 15 U.S.C. § 1681o.

467. Defendants, and each of them, willfully failed to comply with the provisions of 15 U.S.C. § 1681i.

468. Defendants, and each of them, negligently failed to comply with the provisions of 15 U.S.C. § 1681i.

469. Defendants' alleged conduct against Plaintiff herein in violation of the FCRA was willful.

470. Defendants' alleged conduct against Plaintiff herein in violation of the FCRA was negligent.

471. Defendants, and each of them, willfully failed to comply with the requirements imposed under the FCRA, 15 U.S.C. § 1681, *et seq.*, including, but not limited to, failing to comply with reinvestigation requirements in 15 U.S.C. § 1681i.

472. As a result of Defendants' violations of the FCRA, Plaintiff has suffered, continues to suffer, and will suffer future damages, including, but not limited to, denial of credit, lost opportunity to receive credit, damage to reputation, worry, distress, frustration, embarrassment, and humiliation, all to his damages, in an amount to be determined by the jury.

473. Plaintiff is entitled to punitive damages from Defendants, and each of them, in an amount to be determined by the jury.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM    INDEX NO. 150895/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/20/2025

474.    Plaintiff is entitled to actual damages from Defendants, and each of them, in an amount to be determined by the jury.

475.    Plaintiff is entitled to actual damages from Defendants, and each of them, in an amount to be determined by the jury in addition to any statutory damages in an amount to be determined by the Court.

476.    Plaintiff is entitled to his attorney's fees.

## VII.    JURY TRIAL DEMAND

477.    Plaintiff demands a jury trial on all issues so triable.

## VIII.    DEMAND FOR RELIEF

478.    WHEREFORE, Mr. Jones demands entry of judgment in favor of Plaintiff and against Defendants EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX, EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN, TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION, and each of them, for the following:

(a) **FIRST CAUSE OF ACTION – Violation(s) of NY GBL § 380-F ("NYFCRA")**

    i.    actual damages in an amount to be determined according to proof at trial;

    ii.    costs of this action together with reasonable attorney's fees; and

    iii.    such other and further relief that the court deems appropriate.

(b) **SECOND CAUSE OF ACTION – Violation(s) of 15 U.S.C. § 1681i ("FCRA")**

    iv.    actual damages in an amount to be determined according to proof at trial;

    v.    statutory damages (not less than $100 and not more than $1,000);

    vi.    such amount of punitive damages as the court may allow;

    vii.    costs of this action together with attorney's fees; and

    viii.    such other and further relief that the court deems appropriate.

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

Respectfully submitted,

Dated: New York, New York
   January 9, 2025

Brian L. Ponder, Esq.
BRIAN PONDER LLP
TRIAL LAWYERS
745 Fifth Avenue, Suite 500
New York, New York 10151-0099
Telephone: (646) 450-9461 (not for service)
Email: brian@brianponder.com (not for service)
ATTORNEY FOR PLAINTIFF

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM
NYSCEF DOC. NO. 1

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WESLEY JONES, <br><br> Plaintiff, <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES LLC dba EQUIFAX; EXPERIAN INFORMATION SOLUTIONS, INC. dba EXPERIAN; TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION; <br><br> Defendants. | Index No. <br><br> **PLAINTIFF'S VERIFICATION PURSUANT TO NY CPLR § 3020** |

I, **WESLEY JONES**, swear, affirm, and declare under penalties of perjury and state:

1. I am the plaintiff in the above-entitled civil action;

2. I have read the foregoing **VERIFIED COMPLAINT AND JURY DEMAND** and know the contents thereof; and

3. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Dated: January 9, 2025

_____
WESLEY JONES

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 2

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

# Exhibit A

**FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM**
NYSCEF DOC. NO. 2

INDEX NO. 150895/2025
RECEIVED NYSCEF: 01/20/2025

 WESLEY JONES

March 3, 2024



Dear WESLEY JONES:

We have received your request concerning inaccurate information on your Equifax credit file.

Because the information you provided as proof of your identity does not match the information we currently have on your credit file, we ask that you **send us a copy of two different items - one from each of the two categories listed below**. One item will verify your identity and the other will verify your current address.

**Category 1) IDENTIFICATION**
Please make a copy of **one of the following items**.
The item you choose **MUST** contain your complete 9-digit Social Security number.

- Pay stub with complete U.S. Social Security number
- W-2 form with complete U. S. Social Security number
- Valid Social Security Card

Note: 'A Work Permit Only' card is not valid proof of a SSN.

**Category 2) CURRENT ADDRESS**
Please make a copy of **one of the following items**.
The item you choose **MUST** contain your current mailing address of 3245 THORNERIDGE TRL Douglasville, GA 30135-3059.

- Driver's license
- Rental/lease agreement or house deed
- Pay stub with address
- Utility bill (i.e. gas, electric, water, cable, residential telephone bill) with current service address.

**Again, we need a total of two items -- one item from each of the categories above -- to process your request. Please submit those items along with this letter to the following address:**

**Equifax Information Services LLC**
**P.O. Box 105069**
**Atlanta, GA 30348-5069**

To ensure that your request is processed without delay, please enlarge photocopies and ensure the information is legible. Illegible documents or documents that contain highlights may cause delay in processing as we may have to ask you to resubmit your request with more legible documents.

Please return this letter along with the requested information and your original correspondence/request to the address below.

Equifax Information Services LLC
P.O. Box 740256

000008053-FLT                                    4062551515-MX7-0d15017a0000028a-03032024

FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM

NYSCEF DOC. NO. 3

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

# Exhibit B

**FILED: NEW YORK COUNTY CLERK 01/20/2025 10:33 AM**
NYSCEF DOC. NO. 3

INDEX NO. 150895/2025

RECEIVED NYSCEF: 01/20/2025

WESLEY JONES

August 19, 2024

Dear WESLEY JONES:

We have received your request concerning inaccurate information on your Equifax credit file.

Because the information you provided as proof of your identity does not match the information we currently have on your credit file, we ask that you **send us a copy of two different items - one from each of the two categories listed below.** One item will verify your identity and the other will verify your current address.

**Category 1) IDENTIFICATION**
Please make a copy of **one of the following items.**
The item you choose **MUST** contain your complete 9-digit Social Security number.

- Pay stub with complete U.S. Social Security number
- W-2 form with complete U. S. Social Security number
- Valid Social Security Card

Note: 'A Work Permit Only' card is not valid proof of a SSN.

**Category 2) CURRENT ADDRESS**
Please make a copy of **one of the following items.**
The item you choose **MUST** contain your current mailing address of 3245 THORNERIDGE TRL Douglasville, GA 30135-3059.

- Driver's license
- Rental/lease agreement or house deed
- Pay stub with address
- Utility bill (i.e. gas, electric, water, cable, residential telephone bill) with current service address.

**Again, we need a total of two items -- one item from each of the categories above – to process your request. Please submit those items along with this letter to the following address:**

**Equifax Information Services LLC
P.O. Box 105069
Atlanta, GA 30348-5069**

To ensure that your request is processed without delay, please enlarge photocopies and ensure the information is legible. Illegible documents or documents that contain highlights may cause delay in processing as we may have to ask you to resubmit your request with more legible documents.

Please return this letter along with the requested information and your original correspondence/request to the address below.

Equifax Information Services LLC
P.O. Box 740256

000016247-FLT

4229764813-MM1-0dbe011900006854-08192024